# IN THE SUPREME COURT OF IOWA

No. 13–1757

Filed May 8, 2015

**IN RE THE MARRIAGE OF TRACY LYNN HOFFMAN AND ERNST FRANKLIN HOFFMAN,**

Upon the Petition of
**TRACY LYNN HOFFMAN,**

Appellant,

And Concerning
**ERNST FRANKLIN HOFFMAN,**

Appellee.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Polk County, Robert J. Blink, Judge.

A father seeks further review of a court of appeals decision denying a change in physical care of the father's two children after his former wife moved from Polk County to Monroe County with her new spouse. **DECISION OF COURT OF APPEALS AFFIRMED; DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED.**

Eric G. Borseth of Borseth Law Office, Altoona, for appellant.

Alexander E. Wonio and David L. Brown of Hansen, McClintock & Riley, Des Moines, for appellee.

**HECHT, Justice.**

In this case, we determine whether a substantial change of circumstances justifying a modification of a dissolution decree occurred when a mother with joint legal custody and primary physical care of two children moved approximately seventy miles from a Des Moines suburb to a rural home in a new school district. Upon our de novo review, we find the children's father failed to prove the change of circumstances justified a modification of the decree. Accordingly, we affirm the court of appeals decision, reverse the district court's order modifying the physical care provisions of the parties' dissolution decree, and remand for determination of child support and a visitation schedule based upon the present circumstances.

## I. Background Facts and Proceedings.

Ernst Hoffman,[1] an emergency room physician, married Tracy Hoffman,[2] a registered nurse, in 1996. The couple had two children together: a daughter born in 1999 and a son born in 2002. Tracy became the primary caretaker of the children, enabling Ernie to concentrate his energy on his profession and provide a high standard of living for the family.

During the marriage, the Hoffman family spent much of their leisure time engaging in equine and rodeo activities, including barrel-racing and roping competitions. According to Tracy, the parties' daughter has "grown up on horses" and has had success in competitive barrel racing, pole bending, goat tying, and pleasure horse events. The daughter had her best season in 2012, earning championship honors at

[1]Mr. Hoffman also goes by "Ernie," so we use that name here.

[2]Tracy's last name is now Bain. We refer to her as Tracy.

two separate rodeos. The parties' son also participates in rodeo events, including dummy roping, breakaway roping, barrels, and poles.

Ernie and Tracy divorced in 2006. The divorce decree incorporated the parties' stipulations and contained no provision establishing that the parties agreed to remain in a particular school district or geographical area. The decree granted the parents joint legal custody of the children, but allocated primary physical care of the children to Tracy, with Ernie receiving extraordinary visitation.[3] *See* Iowa Ct. R. 9.9 (defining "extraordinary visitation" as visitation that "exceeds 127 days per year").

Tracy and Ernie maintained residences in close proximity to each other for a time after the dissolution. Tracy purchased a home in Pleasant Hill, Iowa, near the former marital residence, with a barn and five acres for the horses Tracy and the children owned. She did so in furtherance of stability for the children after the divorce and for the purpose of minimizing disruption in their schooling and extracurricular—especially equine—activities. Ernie also lived in Pleasant Hill for a time after the divorce, but he eventually built a new home nearby in Runnells, intending to stay in close proximity to, and actively involved with, the children. Ernie has had extensive involvement in the children's lives and has maintained a close relationship with them after the dissolution.

Both Ernie and Tracy eventually married new spouses. Ernie married Dawn Hoffman in 2008. Tracy married Rob Bain in 2012. Rob

---

[3]The visitation arrangement called for Ernie to have the children with him every Thursday after school until Friday morning, every other weekend from Thursday after school until Monday morning, every other week during the summer, and alternating holidays and spring break periods.

owns a residence south of Albia, about seventy miles from Ernie and Dawn's home in Runnells.

In 2011, before purchasing the land for the Runnells home, Ernie asked Tracy to confirm she intended to maintain her residence in Pleasant Hill. In an email message to Tracy, Ernie stated he and Dawn "would be looking elsewhere if the kids were going to be pulled to a different area." At the time, Tracy and Rob were engaged, but not yet married. Tracy replied that she and Rob had not yet decided to vacate the Pleasant Hill residence and stated they would "cross that bridge when/if" they needed to do so. Tracy communicated with Ernie the following day, informing him that a move "to Albia at [some point] is a realistic option." Ernie moved forward with his Runnells home construction plans under the assumption Tracy would not move for at least a few years.

Tracy and Rob were married in January 2012, and for several months afterward, maintained two residences—Tracy's in Pleasant Hill and Rob's in Albia. However, Tracy had fallen behind on mortgage payments and was experiencing financial stress. Believing consolidation of two households into one would foster their new family unit, reduce financial pressures, and make their lives less chaotic, they eventually decided to sell Tracy's home in Pleasant Hill and live together in Rob's home near Albia. Tracy's decision to move with the children to Albia was also influenced by the fact that Polk County's zoning ordinance authorized the family to keep only two horses on the Pleasant Hill property. This zoning restriction posed a problem because she and the two children kept at least three and sometimes as many as five horses at any given time.

Tracy listed her Pleasant Hill property for sale, but did not promptly notify Ernie. When he was informed of the listing by the parties' daughter on May 10, 2012, Ernie asked Tracy whether she had made plans to move. Assuming a change of residence was not imminent because it could take many months to sell her property, Tracy told Ernie no specific plan for a move had been established.

Tracy later decided to move with the children to Albia in December 2012. She informed Ernie of this plan by email on November 27, 2012. After learning of the imminent move, Ernie promptly filed a petition seeking a modification of the physical care and child support provisions of the dissolution decree and sought injunctive relief preventing Tracy from changing the children's residence. Ernie asserted the proposed move would disrupt the children's lives by pulling them away from teachers, friends, and peers; prevent the children from participating in the athletic activities they enjoyed in the Southeast Polk Community School District; separate them from their half-brother, R.H.;[4] negatively affect their relationship with four grandparents living in the Des Moines area; and substantially interfere with his extraordinary visitation and active role in parenting the children. Tracy filed a counterclaim seeking an increase in child support to account for a substantial increase in Ernie's income since the 2006 dissolution decree.

The district court denied Ernie's application for a temporary injunction, finding the reason for Tracy's move "[didn't] appear to be for the purpose of circumventing [Ernie]'s rights as a joint legal custodian." Tracy and the children moved to Albia in December 2012, and the

---

[4]R.H. was born to Ernie and Dawn after their marriage. He fell ill during the pendency of the modification proceeding and tragically passed away.

children were enrolled as students in the Albia Community School District in January 2013.

Before ruling on the petition for modification, the district court appointed attorney Lora McCollom as guardian ad litem (GAL) to represent the children's best interests. McCollom interviewed Ernie, Dawn, Tracy, Rob, and the children, and submitted a report to the district court recommending modifications of the decree. In particular, McCollom recommended that Ernie should become the primary physical custodian so that the children could return to schools within the Southeast Polk school district, where they preferred to be. McCollom's recommendation would, in her words, allow the children to "receive their education in a district with more resources, more options, and more activities, while still allowing them to continue to enjoy rodeo and to participate in the other outdoor activities in Albia." McCollom's recommendations were based on her evaluation of several factors considered by this court in *In re Marriage of Frederici*, 338 N.W.2d 156, 160 (Iowa 1983).

The first factor McCollom considered was the reason for Tracy's relocation of the children's residence. *See Frederici*, 338 N.W.2d at 160. McCollom concluded Tracy did not move to Albia to thwart Ernie's parental rights. However, McCollom believed the move was a matter of "convenience to Tracy and to Rob, and not for the best interests of the kids" who were separated from their friends and much of their family as a consequence of their relocation. McCollom's report also emphasized that Tracy did not move to Albia in furtherance of a job promotion or to be closer to a family support system.

McCollom also based her recommendations on an assessment of the characteristics of the children's new home environment and its

distance from Polk County. *See id.* She concluded the Albia residence provided the children with a better venue for their rodeo and other outdoor activities.[5] Yet, McCollom found the rural home located several miles outside Albia is somewhat "isolated" and requires the children to spend substantial time in the car before school on Mondays when returning from weekends with Ernie.

McCollom's report assessed other advantages and disadvantages of the Albia residence. *See id.* Among the perceived advantages was the fact that the Albia school district offers a lower teacher-to-student ratio than the Southeast Polk school district. The smaller school in Albia, McCollom opined, also offers the children the prospect of enhanced opportunities to participate in school-sponsored sports activities. Disadvantages arising from the move to Albia, according to McCollom, included a loss of mid-week overnight visits with Ernie during the school year and the increased distance affecting visitation. In comparing the academic opportunities offered by the two school districts, McCollom cited data suggesting that the Southeast Polk school district offered higher student proficiency rates, better graduation rates, and a greater percentage of graduates achieving college degrees.

McCollom's assessment also considered the impact of the move on both the children and their parents. *See id.* She noted both children experienced a modest diminution in their academic performance after moving to Albia. The move was a substantial adjustment for them and, not unexpectedly, produced stress in their relationship with Tracy. Both

---

[5]Rodeo is an integral part of the children's lives. Both children stated during separate one-on-one interviews with McCollom that the best aspect of living in Albia was their horses and rodeo activities and that they both wanted to continue participating in rodeo.

children reported to McCollom that they missed their friends and activities in Polk County.

McCollom noted the children have the luxury of having two good, loving parents and two caring and attentive step-parents who provide healthy and suitable home environments for the children. However, she opined the move to Albia constitutes a material and substantial change in circumstances justifying a change in the physical care provisions of the divorce decree. McCollom recommended primary care be transferred to Ernie in part because she believes better academic opportunities are available to the children in the Southeast Polk school district, because the children would prefer to live in Runnells where they would be closer to more friends and extended family, and because the children's equine and rodeo interests could be best facilitated during extended summer visitation with Tracy at the Albia residence.

The district court modified the decree by granting Ernie primary physical care, prescribing an amended parenting schedule, and setting a child support obligation for Tracy. The court largely followed McCollom's recommendations and found "Tracy's decision to relocate is premised primarily on her wants, rather than the children's best interests or their needs."

Tracy appealed and sought a stay of the district court's ruling. We granted the stay and transferred the case to the court of appeals. The court of appeals concluded Ernie had failed to prove a substantial change of circumstances affecting the best interests of the children. The court of appeals also concluded Ernie failed to prove he has a superior ability to minister to the children's needs. The court therefore reversed

the modification ruling in part[6] and remanded the case to the district court for the determination of a suitable visitation schedule for Ernie and an appropriate amount of child support under the present circumstances.

Ernie sought, and we granted, further review.

## II.  Scope of Review.

Petitions to modify the physical care provisions of a divorce decree lie in equity.  *See In re Marriage of Quirk-Edwards*, 509 N.W.2d 476, 476 (Iowa 1993).  Accordingly, our review is de novo.  *Id.*; *see* Iowa R. App. P. 6.907.  Although we make our own findings of fact, "when considering the credibility of witnesses the court gives weight to the findings of the trial court" even though we are not bound by them.  *In re Marriage of Udelhofen*, 444 N.W.2d 473, 474 (Iowa 1989).  The children's best interest is the "controlling consideration."  *In re Marriage of Leyda*, 355 N.W.2d 862, 865 (Iowa 1984); *see also In re Marriage of Weidner*, 338 N.W.2d 351, 356 (Iowa 1983) ("first and foremost consideration").  Utilizing the best-interest standard "provides the flexibility necessary to consider unique custody issues on a case-by-case basis."  *In re Marriage of Hansen*, 733 N.W.2d 683, 696 (Iowa 2007).

## III.  Analysis.

The general principles guiding our adjudication of petitions for modification of dissolution decrees are well-established:

> To change a custodial provision of a dissolution decree, the applying party must establish by a preponderance of evidence that conditions since the decree was entered have so materially and substantially changed

---

[6]The court of appeals affirmed the district court's determination that the parties should pay their own attorney fees incurred in the district court proceedings.  However, it ordered Ernie to pay $7625 toward Tracy's attorney fees on appeal.

> that the children's best interests make it expedient to make the requested change. The changed circumstances must not have been contemplated by the court when the decree was entered, and they must be more or less permanent, not temporary. They must relate to the welfare of the children. A parent seeking to take custody from the other must prove an ability to minister more effectively to the children's well being.

*Frederici*, 338 N.W.2d at 158. These principles clearly place a heavy burden on a parent requesting a modification. The burden is necessarily a heavy one undergirding the fundamental policy that "once custody of children has been fixed it should be disturbed only for the most cogent reasons." *Id.*

A decision by a joint custodial parent with physical care of minor children to change residences is "the kind of decision the other joint custodian has a right to be consulted about." *Id.* at 159. Ernie contends Tracy failed to inform him and consult with him about her plan to move the children from their Polk County home. *See In re Marriage of Mayfield*, 577 N.W.2d 872, 874 (Iowa Ct. App. 1998) (concluding one parent's decision to move "should not have been made without [the other parent]'s input," and considering the lack of communication "adverse to [the moving parent's] position"). While we believe Tracy could have been more forthcoming about the development of her plan to move with the children to Albia, the record reveals Ernie anticipated the move might occur and clearly communicated his opposition to the prospect more than a year before it happened. When, as in this case, joint custodial parents disagree on the question of whether their children's residence should be changed, "the parent having physical care of the children must, as between the parties, have the final say concerning where [the children's] home will be." *Frederici*, 338 N.W.2d at 159. We have noted that "[t]his authority is implicit in the right and responsibility to provide

the principal home for the children. The right would mean little if the other custodian could veto its exercise." *Id.* at 159–60. And in our "highly mobile society"—a characterization we used in *Frederici* that is surely no less true today—periodic relocation is hardly a surprise. *Id.* at 160.

Yet, Tracy's authority as the physical care custodian to decide the location of the children's residence is not unlimited. Her decision is, as a consequence of Ernie's modification proceeding, subject to judicial review based on well-established principles protecting the best interests of the children. With these principles in mind, we turn to the circumstances surrounding the children's move from Polk County to rural Albia.

**A. Tracy's Motive for the Move.** We find no credible evidence in this record tending to prove Tracy moved the children to rural Albia to defeat Ernie's visitation rights or undermine his relationship with the children. *Cf. In re Marriage of Grantham*, 698 N.W.2d 140, 146 (Iowa 2005) (modifying physical care after one parent "maintained a persistent pattern of conduct that . . . served to diminish the children's relationship with their mother"); *Quirk-Edwards*, 509 N.W.2d at 480 (modifying physical care when "the evidence was overwhelming that [one parent] willfully sought to deprive [the other] of . . . visitation"); *Leyda*, 355 N.W.2d at 867 (modifying physical care when one parent's relocation was "motivated in large part by [a] driving need to separate [the child] from her father, emotionally and physically"); *In re Marriage of Downing*, 432 N.W.2d 692, 694–95 (Iowa Ct. App. 1988) (modifying physical care when the moving parent denied visitation, withheld health information, intercepted mail, and even "remov[ed] the telephone from the house when she left the children alone so they would not call their father"). The move was instead calculated to form a more normal and cohesive family unit

with her new husband and the children. We conclude Tracy's motivations to live under the same roof with her new husband and to eliminate financial pressures associated with maintaining two separate households were quite appropriate under the circumstances. Although Tracy did not relocate to Albia to realize a more lucrative employment opportunity as was the case in *Frederici*, her motivations for the move were no less legitimate. *See Frederici*, 338 N.W.2d at 158; *In re Marriage of Behn*, 416 N.W.2d 100, 101 (Iowa Ct. App. 1987) ("We do not find Barbara's moves with her [new] husband justify a change of physical care."); *see also Hollandsworth v. Knyzewski*, 79 S.W.3d 856, 873 (Ark. Ct. App. 2002) ("A rule of law that effectively requires custodial parents to gamble custody of their children before they can live with their children and new spouses . . . seems the very antithesis of domestic stability."); Theresa Glennon, *Still Partners? Examining the Consequences of Post-Dissolution Parenting*, 41 Fam. L.Q. 105, 125–36 (2007) (exploring a multitude of reasons why parents with physical care choose to move).

**B. Location, Distance and Disruption.** Ernie is understandably opposed to the move to Albia because it interferes with the convenient visitation he enjoyed when the children lived in Pleasant Hill. The children's new home separates them from Ernie by approximately seventy miles and makes visitation significantly more challenging to him. Yet, we found in *Frederici* a 700-mile move causing much greater geographic separation between children and a joint custodial parent was "not alone sufficient to justify shifting physical care to [a] non-moving joint custodian." *Frederici*, 338 N.W.2d at 160; *see also In re Marriage of Whalen*, 569 N.W.2d 626, 630 (Iowa Ct. App. 1997) (declining to modify physical care when one parent moved to a new residence fewer than 150 miles away with a new spouse, even though the nonmoving parent "was

first told of the move by the children, who went to him telling him they did not want to move"); *In re Marriage of Hunt*, 476 N.W.2d 99, 100, 102 (Iowa Ct. App. 1991) (finding no substantial change in circumstances when one parent moved from Waterloo to Muscatine, approximately 130 miles); *In re Marriage of Howe*, 471 N.W.2d 902, 903 (Iowa Ct. App. 1991) (finding no substantial change in circumstances when one parent moved from Greenfield to Adel, a distance of forty-two miles). Further, "[p]hysical care issues are not to be resolved upon perceived fairness to the *spouses*, but primarily upon what is best for the *child*." *Hansen*, 733 N.W.2d at 695.

Ernie contends the move of seventy miles has disrupted the children's lives by distancing them from their grandparents and network of friends, and displacing them from schools where they were comfortable. The record shows the disruption has produced some emotional discord between Tracy and the parties' teenage daughter, who expressed to the GAL a desire to move back to the Pleasant Hill area where her friends reside. On one occasion, Tracy and the daughter slapped each other. On another occasion while they were traveling in a car, an argument ensued and emotions escalated. Tracy parked the car and used her phone to summon a police officer who calmed the daughter and defused the conflict. We find, however, that these unfortunate incidents in which the emotions of a mother and her teenage daughter escalated do not fairly characterize the quality and character of the relationship. This finding is consistent with the GAL's assessment that despite "bumps in the road," mother and daughter "do very well together."

As we have previously noted, "[n]o move is easy, even for adults. Some emotional trauma can be expected whenever children are removed

from familiar to unfamiliar surroundings." *Frederici*, 338 N.W.2d at 160. And "just as [the emotional trauma normally attending a move] does not prevent parents from moving generally, it is not alone sufficient to justify shifting physical care to the non-moving joint custodian." *Id.* Although we do not intend to minimize the reality of such trauma, we are convinced on this record that it is transitory and not permanent in nature. Notwithstanding the period of adjustment for the children, the move will allow them to maintain their close relationship with Tracy, who has been their primary caretaker since their births. *See Hansen*, 733 N.W.2d at 696 ("Stability and continuity factors tend to favor a spouse who, prior to divorce, was primarily responsible for physical care."). Our rules governing modification of decrees place "greater importance on the stability of the relationship between [children] and the[ir] primary caregiver [than on] the physical setting of the child[ren]." *In re Marriage of Williams*, 589 N.W.2d 759, 762 (Iowa Ct. App. 1998); *see Whalen*, 569 N.W.2d at 630 ("While stability is important in a child's life, stability can be nurtured as much by leaving children with the same custodial parent as leaving them in the same neighborhood.").

**C. The Children's Preferences.** The parties' daughter expressed to McCollom an adamant preference to remain in the Southeast Polk school district. Her brother reported that he misses his friends in Polk County, but he stopped short of expressing a desire to move back there. The court considers a child's wishes on this question, taking into account the child's age and maturity. Iowa Code § 598.41(3)(*f*) (2013); *see Hansen,* 733 N.W.2d at 696 (stating although section 598.41(3) does not expressly apply to physical care decisions, the factors in the statute are relevant considerations); *see also Jones v. Jones*, 175 N.W.2d 389, 391 (Iowa 1970) ("[W]hen a child is of sufficient age, intelligence, and

discretion to exercise an enlightened judgment, his or her wishes, though not controlling, may be considered by the court, with other relevant factors, in determining child custody rights."). Although the teenage daughter's preference is significant in our view, it is entitled to less weight in this modification action than it would be given when allocating physical care in an original custody proceeding. *See In re Marriage of Zabecki*, 389 N.W.2d 396, 399–400 (Iowa 1986); *Smith v. Smith*, 257 Iowa 584, 591, 133 N.W.2d 677, 681 (1965). Iowa courts have noted this distinction where, as here, a child's preference to reside with one parent seems to be rooted in resistance to a physical care provider's relocation. *See In re Marriage of Thielges*, 623 N.W.2d 232, 239 (Iowa Ct. App. 2000) (denying modification when the record suggested one child's "preference has more to do with her Iowa friends and school than it does with [her parents]"); *In re Marriage of Smith*, 491 N.W.2d 538, 539–40 (Iowa Ct. App. 1992) (denying modification where children were unhappy about their relocation from an urban area to a rural area).

**D. Relative Advantages and Disadvantages of the Albia Residence.** A central feature of McCollom's rationale for recommending a modification of primary care was her conclusion that the Southeast Polk school district offers more resources and educational opportunities than the Albia school district. After conducting online research and consulting unidentified educators, McCollom concluded the Southeast Polk school district has "far more resources, opportunities, and course options than Albia." She also compared other data from the two districts and reported as follows:

> Southeast Polk students have a higher percentage of 8th grade students proficient in reading (77.42% vs. 72.54%), and a higher percentage of 11th grade students proficient in both math (74.18% vs. 73.37%) and reading (73.80% vs.

71.01%).  The only area that Albia had a higher percentage of proficient students was 8th grade math (80% vs. 77.58%).

McCollom also reported other data suggesting that higher percentages of Southeast Polk High School students graduate from high school (93.1% vs. 81.6%), complete some college courses (59.8% vs. 37%), complete an associate degree (23.8% vs. 17.7%), or complete a bachelor's degree (23.8% vs. 12.5%) than their counterparts from the Albia school district.

The court of appeals considered these comparative data and concluded "the difference, if any, between the quality of the two schools is not material and does not constitute a substantial change in circumstances."  The court reasoned further:

> The data regarding graduation rates and college matriculation rates does not necessarily tell us anything about the quality of instruction within the two school districts.  First, the difference in some metrics do not appear statistically meaningful or legally material.  For example, the GAL reported that Southeast Polk students have a higher percentage of 11th grade students proficient in math (74.18% vs. 73.37%).  Further, the data [were] not one-sided.  For example, the GAL reported Albia has a higher percentage of 8th grade students proficient in math (80% vs. 77.58%).  In short, the data was mixed or inconclusive at best.  Further, because the data cited by the GAL was static, it fails to tell us anything meaningful about the trends within each district and the persistence of any meaningful distinction between the performance of the students within each district.  Most important, however, the GAL's conclusion that the data supported the conclusion that one district was superior to the other is not sound.  The GAL's report did not account for socioeconomic differences (such as race, ethnicity, marital status of the parents, educational attainment of the parents, household income etc.) between the two school districts.  Relatedly, the GAL's report did not account for the differences between a large urban district and a small rural school district and the potentially different aspirations of the students within such districts as measured by plans for educational advancement, occupational choice, and future income expectations.  In sum, the data, in particular college entrance data, may not reflect on the quality of instruction within the respective districts so much as the different expectations and aspirations of the students and parents within the districts.

> The GAL's report also focused greatly on the data provided on the schools' website without accounting for other factors that might relate to the overall educational experience of the children. For example, the GAL report did not account for the Albia district's correspondence program with Indian Hills Community College that provided educational opportunity in addition to that provided by Albia.

We agree with the reasoning and conclusions of the court of appeals on this point and conclude the record does not establish that the children's educational interests dictate that they should reside in the Southeast Polk district. *Cf. In re Marriage of Moore*, 526 N.W.2d 335, 337 (Iowa Ct. App. 1994) (concluding the differences between public and private school did not substantiate a parent's concern that one type of education was inferior, and did "not provide a basis for modification"). Notwithstanding the stress associated with the move to Albia and the unfortunate loss of their step-brother during the period of adjustment to the move, the children's course grades since the move have remained essentially stable compared to their academic performance before the move.

In assessing the other advantages and disadvantages of the children's Albia residence, we find relative equipoise. Although the children have verbalized that they miss athletic activities they enjoyed in the Southeast Polk district, they have become involved in similar activities in Albia and likely will see greater opportunities there to participate in organized sports. Separation from friends who lived in their Pleasant Hill neighborhood could be counterbalanced by the children's prospects for new friendships in Albia and the greater opportunities to enjoy their equine hobbies in a rural area.[7] And even though the children's primary residence is in Albia, they will be able to

---

[7]The record reflects the Bain family now keeps more than fifteen horses on their Albia property.

maintain regular contact with Polk County and the important people in their lives who reside there.

We do not underestimate the disadvantages the relocation poses for Ernie. The distance he must travel for visitation and to attend school and athletic events is substantial if the children remain in Albia. The frequent travel to and from Albia will cost him both time and money if primary care of the children is not modified. However, his work schedule —working twelve-hour shifts four nights and eight days each month— could provide him with extraordinary flexibility for visitation opportunities unavailable to other parents with customary work-week schedules.[8]

Upon our de novo review of the record, we agree with the court of appeals' determination that, under all the circumstances presented here, Ernie has failed to meet his heavy burden to prove the children's move to Albia constitutes a substantial change of circumstances affecting the best interests of the children. We also agree with that court's conclusion that Ernie has failed to prove a superior ability to minister to the needs of the children. Although he is an excellent parent who has demonstrated an admirable record of involvement in the lives of the children, we cannot find on this record that his ability to minister to the needs of the children is superior to Tracy's. "If both parents are found to be equally competent to minister to the children, custody should not be changed." *In re Marriage of Rosenfeld*, 524 N.W.2d 212, 213 (Iowa Ct. App. 1994).

---

[8]Ernie's work schedule also requires him to work every other weekend and every other holiday. Since the children's move to Albia, Ernie has chosen not to use his days off work to attend the children's activities because he "doesn't agree with them living in [and] having school in Albia."

We have considered all of the arguments of the parties but have addressed only those of material significance to our decision. In view of our decision, we must remand this case to the district court for a determination of an appropriate visitation schedule. As the district court ordered a modification in Ernie's favor, it did not decide Tracy's claim that Ernie's child support obligation should be increased to reflect a substantial change in his income. Accordingly, on remand the district court shall modify Ernie's child support obligation consistent with the parties' income and the child support guidelines.

**IV. Conclusion.**

"We do not award custody by determining whether a rural or urban Iowa upbringing is more advantageous to a child." *In re Marriage of Engler*, 503 N.W.2d 623, 625 (Iowa Ct. App. 1993). Because we conclude Ernie has failed to prove the children's move to Albia constitutes a substantial change of circumstances or that his ability to minister to the needs of the children is superior to Tracy's, we conclude the district court erred in modifying the dissolution decree. Accordingly, we affirm the decision of the court of appeals and reverse the district court's modification ruling. We remand to the district court for a determination of an appropriate visitation schedule and modification of Ernie's child support obligation based on the present financial circumstances of the parties and the child support guidelines.

**DECISION OF COURT OF APPEALS AFFIRMED; DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED.**

All justices concur except Waterman, Wiggins, and Mansfield, JJ., who dissent.

**WATERMAN**, **Justice (dissenting).**

I respectfully dissent. I would affirm the district court that decided this case fairly and in the best interest of the children based on live testimony and the recommendations of an experienced guardian ad litem. Under the original decree, both parents agreed to continue living in the Southeast Polk Community School District, home to their extended families. That arrangement worked well for all concerned. Then the mother, without consultation or adequate warning, abruptly moved their children with her to Albia, seventy miles away. The move was for her own convenience and unrelated to any change in her employment. The district court correctly determined the father established a substantial change in circumstances warranting modification of the custody provisions of the original decree. The district court's modification kept the children together with their father in their existing school district, consistent with the strong preference of the high-school-age daughter. We should not second-guess the district court's ruling on appellate review of a cold transcript.

### I. We Should Defer to the District Court's Findings.

It is well-settled that "[b]ecause [the] trial court was present to listen and observe the witnesses, we give weight to its findings." *In re Marriage of Zabecki*, 389 N.W.2d 396, 398 (Iowa 1986). There are good reasons to defer to the district court's factual findings:

> A trial court deciding dissolution cases is greatly helped in making a wise decision about the parties by listening to them and watching them in person. In contrast, appellate courts must rely on the printed record in evaluating the evidence. We are denied the impression created by the demeanor of each and every witness as the testimony is presented.

*In re Marriage of Vrban*, 359 N.W.2d 420, 423 (Iowa 1984) (citation omitted) (internal quotation marks omitted). We have recently reiterated "live, in-court testimony is preferable." *Book v. Doublestar Dongfeng Tyre Co.*, 860 N.W.2d 576, 598 (Iowa 2015); *see also Burke v. Quick Lift, Inc.*, 668 F. Supp. 2d 370, 382 n.11 (E.D.N.Y. 2009) (" 'In determining credibility, there is nothing like the impact of live *dramatis personae* on the trier of the facts.' " (quoting *Polaroid Corp. v. Casselman*, 213 F. Supp. 379, 382–83 (S.D.N.Y. 1962))).

> "Even though our review is de novo we give weight to trial court findings of fact, especially when considering credibility of witnesses. As difficult as it is to assess credibility of live testimony, it is more difficult to assess credibility from a cold transcript."

*In re Marriage of Woodward*, 228 N.W.2d 74, 75 (Iowa 1975) (quoting *Zaerr v. Zaerr*, 222 N.W.2d 476, 477 (Iowa 1974)). The court of appeals recently elaborated on the fact-finding advantages enjoyed by the district court's front-row seat:

> A witness's facial expressions, vocal intonation, eye movement, gestures, posture, body language, and courtroom conduct, both on and off the stand, are not reflected in the transcript. Hidden attitudes, feelings, and opinions may be detected from this "nonverbal leakage." Thus, the trial judge is in the best position to assess witnesses' interest in the trial, their motive, candor, bias and prejudice.

*In re Marriage of Rademacher*, No. 11–0798, 2011 WL 5868041, at *3 (Iowa Ct. App. Nov. 23, 2011) (quoting Thomas Sannito & Peter J. McGovern, *Courtroom Psychology for Trial Lawyers* 1 (1985)).

We should give even greater deference to the district court's findings on close questions. *In re Marriage of Udelhofen*, 444 N.W.2d 473, 474 (Iowa 1989) ("The deference we pay to trial court findings is especially strong here. As will appear, the case turns, not so much on what was said and done, as upon the implications of the words and

actions of the parties."); *In re Marriage of Reed*, No. 09–0029, 2009 WL 4122884, at *6 (Iowa Ct. App. Nov. 25, 2009) ("In close cases such as this, we give careful consideration to the district court's findings."); *In re Marriage of Whalen*, 569 N.W.2d 626, 630 (Iowa Ct. App. 1997) ("The issue of whether Charles has met the heavy burden for modification is close. We give weight to the fact findings of the trial court, particularly as to credibility of witnesses, and affirm.").

The majority, by second-guessing the district court's equitable resolution of a close case, will spawn more appeals, increasing the costs to litigants in family law cases, many of whom can ill-afford an appeal. The better practice is to affirm the district court's decision in close cases. Against this backdrop, I will now focus on the evidence supporting the district court's decision in Ernie's favor.

**II. Tracy's Move to Albia Was Motivated by Her Own Self-Interest, Not the Best Interests of the Children.**

The district court found, "Tracy's decision to relocate is premised primarily on her wants, rather than the children's best interests or their needs." When Tracy moved, she had not yet sold her house and continued to commute to work in Des Moines. Her new husband, Rob, had lived with her in Des Moines for nearly two years. Rob's job required frequent travel and did not demand that he live in Albia. Tracy testified that one of the primary reasons for her move was that she could legally only have two horses in Des Moines.[9] Tracy uprooted the children from their close family and school relationships in Southeast Polk primarily so that she could pursue her own interest in horses and rodeo.

---

[9]Tracy testified she usually required space for three to five horses, depending on family needs. During the pendency of this appeal, she acquired a sixteenth horse.

"Our appellate decisions which have previously addressed the issue of a change in residence as a ground for modification generally focus on the motivation behind the move, as well as the overall impact of the move on the children." *Dale v. Pearson*, 555 N.W.2d 243, 245 (Iowa Ct. App. 1996). *In re Marriage of Frederici* was a seminal case establishing the burden for modification of child support when the custodial spouse sought to move out of state. 338 N.W.2d 156, 158 (Iowa 1983). We found it significant that the mother's relocation in that case was to pursue a "unique and promising career opportunity." *Id.* at 160. We affirmed the judgment of the district court, vacating the court of appeals decision. *Id.* at 161. Unlike in *Frederici*, Tracy was not motivated by a new job opportunity, but by her desire to raise more horses for her personal recreation.

Iowa appellate courts have not hesitated to affirm custody modifications when a parent relocates for reasons of personal preference rather than for work. In *In re Marriage of Quirk-Edwards*, we affirmed a modification giving physical custody to a father based on a mother's relocation four months after the divorce. 509 N.W.2d 476, 480 (Iowa 1993). We concluded that the mother had no good reason for making the move. *Id.* at 479. In *Dale*, the court of appeals affirmed the district court's modification transferring physical custody to the father after the mother moved in with her new husband. 555 N.W.2d at 244, 246. The *Dale* court concluded that when the mother moved without having new employment, she "showed no consideration for the overall welfare of [the child] and her relationship with [the father]." *Id.* at 246. The same is true here.

The district court correctly concluded that a modification of custody was appropriate, given Tracy's motivations and actions. Tracy

did not move to advance her career or to seek out new opportunities for the children. The children had more educational opportunities, and church and family connections in Des Moines. My de novo review confirms Tracy moved for her own benefit despite the impact on their children or Ernie, who shared joint custody. The move tore the children away from their friends, their school activities, and significant time they could spend with their father and extended family.

**III. The Best Interests of the Children Are Served by Remaining with Ernie.**

I agree that a parent requesting modification of custody bears a heavy burden, and a custodial parent's relocation does not automatically constitute a significant change in circumstances. *In re Marriage of Frederici*, 338 N.W.2d at 158, 161. However,

> [i]n determining whether removal should be prevented, the trial court must consider all of the surrounding circumstances. They include the reason for removal, location, distance, comparative advantages and disadvantages of the new environment, impact on the children, and impact on the joint custodial and access rights of the other parent.

*Id.* at 160.[10] Because custody cases are fact specific, "[p]rior cases have little precedential value; we must base our decision primarily on the

---

[10]*In re Marriage of Frederici* was decided in 1983. In 2005, the legislature enacted section 598.21D, stating:

> If a parent awarded joint legal custody and physical care or sole legal custody is relocating the residence of the minor child to a location which is one hundred fifty miles or more from the residence of the minor child at the time that custody was awarded, the court may consider the relocation a substantial change in circumstances.

Iowa Code § 598.21D (2007). The plain language of the statute is permissive ("the court may consider"). A move of more than 150 miles alone may not be a substantial change under some circumstances, and a move of less than 150 miles may constitute a substantial change under other circumstances. Thus, the factors discussed in *Frederici* remain relevant.

particular circumstances of the parties in this case." *In re Marriage of Weidner*, 338 N.W.2d 351, 356 (Iowa 1983). The most important factor is the best interests of the children. *In re Marriage of Hansen*, 733 N.W.2d 683, 696 (Iowa 2007); *In re Marriage of Leyda*, 355 N.W.2d 862, 865 (Iowa 1984) (stating that the children's best interest is the "controlling consideration").

Tracy's move interfered not only with the children's ability to maintain their relationship with Ernie, but with their extended families, sports teams, and church communities. There are specific educational opportunities available in the Southeast Polk school district not found in the Albia school district. The district court correctly found its modification of custody was in the best interest of the children.

**A. The Children's Relationship with Ernie and Other Family Members.** The court of appeals has observed that relocation "can present significant obstacles to regular and active visitation by the noncustodial parent." *Dale*, 555 N.W.2d at 245. The majority gives too little weight to the disruption Tracy's move caused the children. Their son and daughter's extended family, including all four grandparents, live in the Des Moines area. During the original dissolution proceedings, Tracy bought a home in the Southeast Polk school district with court approval. Ernie, in reliance, purchased a lot to build a home near Tracy's and close to the children's schools. While his new home was under construction, Ernie rented in the same neighborhood so he could be actively involved in the children's lives. Ernie was granted extraordinary visitation under the original decree. Tracy's sudden and unannounced move to Albia deprives their children of more than fifty Thursday evenings spent with Ernie annually. Ernie testified about the missed opportunity to spend time with their son and daughter:

A. Yeah. I mean, I could go—if I had a ball game, I could go catch the ball game. I could go catch some practice. I could go have lunch with them—if I wasn't working—at the school.

Q. And that's changed since the move; isn't that correct? A. Yes.

Q. It's been a great struggle to stay as involved, even to some minor degree, with these kids? A. Right, it has.

The GAL's report also highlighted the loss of parenting time as the biggest disadvantage of the children's move to Albia:

> In terms of disadvantages, the biggest disadvantage for the kids is clearly the loss of the Thursday nights with their dad. Additionally, both kids share a much stronger bond with Ernie's wife Dawn than they do with Rob (which is likely due to the fact that Dawn has been involved in their lives longer), and they both expressed that seeing Ernie and Dawn every other weekend is not enough. I also see the distance as a disadvantage, especially given the Monday morning drives to Albia and the uncertainty of Iowa weather.

Tracy's move significantly cuts down on the contact Ernie can reasonably have with their son and daughter and makes it more difficult for the children to have an ongoing relationship with Ernie and other family members.

We have noted "a growing body of scholarship suggests that the continued presence and involvement of both parents is often beneficial to the lives of children." *In re Marriage of Hansen*, 733 N.W.2d at 693. It is a legislative goal for children of divorced parents to have as much ongoing contact as possible with the noncustodial parent. Iowa Code § 598.41(1)(*c*) (2013) ("The court shall consider the denial by one parent of the child's opportunity for maximum continuing contact with the other parent, without just cause, a significant factor in determining the proper custody arrangement."). To support these goals,

> [p]arents in accepting an award of joint custody accept a responsibility to communicate with each other and to support the other parent's relationship with the child. Parents must put away their personal animosities toward

> each other and work together to meet the children's needs. Substantial contact with both parents is one of these needs. Children of a divorce have a need to maintain meaningful relationships with both parents.

*In re Marriage of Fortelka*, 425 N.W.2d 671, 672 (Iowa Ct. App. 1988). Ernie, true to his extraordinary visitation schedule, actively participated in the children's lives, serving as a line coach for his son's football games, visiting the children during lunchtime at school, and stopping by their home in the evenings. Tracy's move to Albia sharply curtails the amount of time Ernie is able to spend with their children.

**B. Tracy's Lack of Communication Makes It Unlikely She Will Support an Ongoing Relationship with Ernie**. The district court stated, "The rather [dictatorial] non-communicative manner in which [Tracy's move to Albia] was executed demonstrates a lack of cooperative parenting that would only be exacerbated by physical distance between the households." A primary physical custodian has the responsibility to engage with the other parent in serious decisions concerning joint custody. *In re Marriage of Mayfield*, 577 N.W.2d 872, 874 (Iowa Ct. App. 1998) ("We consider [the mother] making these decisions without [the father]'s input adverse to her position."). Ernie discovered Tracy had put her house on the market when their daughter received a text from a friend asking about the for-sale sign there. Ernie first learned of Tracy's plan to move the children when their daughter called him in tears two days before Tracy emailed him notification. When Ernie applied for a temporary injunction to prevent Tracy from taking the children to Albia, Judge McLellan observed, "[T]he manner in which [Tracy] acted in informing [Ernie] of the move and her failure to communicate her decision with him is disturbing and should have been handled better." Tracy also posted disparaging comments about Ernie and the legal

system on social media that their children could see. The move to Albia strained Tracy's relationship with their daughter. On one occasion, they slapped each other. On another occasion, matters escalated to the point that Tracy called the police to confront their daughter.

The majority downplays Tracy's behavior preceding her decision to uproot the children from the agreed school district. Yet, every district court judge involved in this case has expressed concern about Tracy's poor communication with Ernie and her pattern of unilateral decision-making disparaging Ernie's rights. Tracy repeatedly substituted motion practice for dialogue. For example, she filed a contempt action against Ernie on December 29, 2006—just two months after the decree of dissolution—over payment of medical expenses. Ernie, who had paid the expenses before he was served with papers, responded with his own claim for contempt against Tracy for obstructing his access to their children. The district court found that Tracy

> is clearly demonstrating her unwillingness to promote and enhance the relationship between the children and [Ernie]. There is clear hypocrisy in Tracy's attitude in this respect. . . . This court feels much the same about Tracy's behavior and attitude as did Judge Lloyd when, early on in the case, he addressed the parties' counter applications for contempt. In a ruling entered April 20, 2006 Judge Lloyd dismissed each party's application against the other and chastised Tracy for seeking contempt against [Ernie] when her behavior was disingenuous.

Despite these admonitions by two district court judges, Tracy continued to file unfounded contempt actions, twice in October of 2007 and again in October of 2008. These contempt actions are symptomatic of Tracy's issues communicating with Ernie. *See In re Marriage of Whalen*, 569 N.W.2d at 628–29 ("We find [the mother's] decision to make provisions for the move without consulting [the father] a violation of the dictates of

the joint custody. This decision indicates an intention on her part not to assure their father's continual involvement in the children's lives.").

The past is prologue. The best predictor of what someone will do tomorrow is what he or she did yesterday. The manner in which Tracy handled her move to Albia shows her unwillingness to support Ernie's relationship with the children going forward. *See In re Marriage of Winnike*, 497 N.W.2d 170, 174 (Iowa Ct. App. 1992) ("In determining what is in the best interests of the child we can look to a parent's past performance because it may be indicative of the quality of the future care that parent is capable of providing."). The district court correctly found the move to Albia would exacerbate the relationship problems resulting from Tracy's poor communication and disingenuous behavior. The trial judges who personally observed the testimony of Tracy and Ernie are better positioned than our court to make that determination.

**C. The Opportunities Available at Southeast Polk**. The majority fails to note specific opportunities available in Southeast Polk for the daughter's career interest as a veterinarian. The GAL's report stated:

> Her preference, as she described to me, is based primarily upon her interest in a career in equine veterinary medicine. There are specific classes available at Southeast Polk which will help M.H. prepare for such a course of study. Additionally, M.H. wanted to study French and it is not offered in Albia. Finally, she also stated that there are many more options for extra-curricular activities, classes, and clubs at Southeast Polk.

Ernie testified that Southeast Polk schools also had specific opportunities allowing students to obtain college credit. Tracy moved the children to a new district in the middle of the school year, with a scant few weeks' notice, when they were already enrolled in athletics and activities in Southeast Polk for the spring semester. All of the children's medical care had taken place in Des Moines, and they were able to

participate in both rodeo and extracurricular activities in Southeast Polk before their move. Both children were also involved in church in Des Moines. The daughter had difficulty making new friends in Albia, and her studies suffered in the weeks leading up to the modification trial.

In *In re Marriage of Frederici*, we evaluated the relative opportunities the two locations offered the children. 338 N.W.2d at 160 ("On the plus side, Littleton appears to be a nice city, and the Denver metropolitan area offers advantages comparable to those in the Des Moines area. With improvement in her income, Virginia should be able to provide the children with the same material advantages they had in Des Moines."). There are specific educational opportunities available at Southeast Polk that are unavailable to the children in Albia. Further, there are educational and medical advantages to the larger school district and hospital systems in Des Moines. The district court correctly relied on those factors in determining the best interests of the children.

**IV. The Daughter's Preference to Remain with Ernie Should Be Given More Weight.**

The daughter's preference to live with her father was just one factor the district court and GAL relied on in concluding physical custody should be modified, but I address it separately because I do not believe the majority gives enough weight to her preference. Our law on the preference of a minor is well settled:

> It is also an almost universal rule that when a child is of sufficient age, intelligence, and discretion to exercise an enlightened judgment, his or her wishes, though not controlling, may be considered by the court, with other relevant factors, in determining child custody rights.

*Jones v. Jones*, 175 N.W.2d 389, 391 (Iowa 1970). The child's preference "is given some weight, but less weight in a modification than in an

original custodial determination." *In re Marriage of Mayfield*, 577 N.W.2d at 873.

> Iowa Code section 598.41(3)(f) provides that in considering what custody arrangement is in the best interests of the minor child, the court shall consider whether the custody arrangement is in accord with the child's wishes or whether the child has strong opposition, taking into consideration the child's age and maturity.

*In re Marriage of Ellerbroek*, 377 N.W.2d 257, 258 (Iowa Ct. App. 1985). There, the court of appeals discussed "numerous factors" when determining how to weigh a minor child's testimony: age and educational level, strength of the preference, intellectual and emotional makeup of the child, relationship with family members, reason for the decision, the advisability of recognizing teenager's wishes, and the recognition that we are not aware of all of the factors that influenced the decision. *Id.* at 258–59.

Ernie and Tracy's daughter, a high school sophomore, is old enough to have a say. She strongly preferred living with her father in the Southeast Polk school district and clashed with her mother in Albia. She wants to attend school in Southeast Polk to follow her career aspirations to be a veterinarian and take advantage of other educational offerings available there. The GAL's report states:

> I believe that . . . M.H.'s preference should be given significant weight. She is an intelligent young woman with an incredibly strong preference; she shares a close relationship with both Ernie and Dawn, and her preference is not based solely upon the discord in her relationship with Tracy. I also believe, unequivocally, that it is in both kids' best interest to remain together and not to be separated from each other.

I agree. Moreover, the GAL and district court judge are better positioned than our appellate courts to determine the weight to be given the daughter's preference.

For all these reasons, I would vacate the court of appeals decision and affirm the district court's modification ruling.

Wiggins and Mansfield, JJ., join this dissent.