In re the **MARRIAGE OF Steven L. UDELHOFEN and Janet M. Udelhofen,**

Upon the Petition of Steven L. Udelhofen, **Appellant,**

And Concerning Janet M. Udelhofen, **Appellee.**

No. 88–466.

Supreme Court of Iowa.

Aug. 16, 1989.

Tom Hyland of Hyland, Laden & Pearson, P.C., Des Moines, for appellant.

Kenneth W. Rittgers, Des Moines, for appellee.

Considered by McGIVERIN, C.J., and HARRIS, SCHULTZ, CARTER and SNELL, JJ.

HARRIS, Justice.

This bitter custody suit involves a bright and attractive little boy who will soon be ten years old. Contestants are his mother and father who were married from 1978 until 1986. Upon dissolution of their marriage, physical custody was awarded to the mother. The trial court rejected the father's subsequent application that custody should be changed to him. The court of appeals reversed. On further review we agree with the court of appeals in placing physical custody with the father.

I. Controlling legal principles, though painfully difficult to apply, are well known and can easily be stated. Our review is de novo. Iowa R.App.P. 4. It is enormously important that this is a modification application, not a direct appeal from an original award. The burden in a custody modification was explained in *In re Marriage of Frederici*, 338 N.W.2d 156, 158 (Iowa 1983), as follows:

> To change a custodial provision of a dissolution decree, the applying party must establish by a preponderance of evidence that conditions since the decree was entered have so materially and substantially changed that the children's best interests make it expedient to make the requested change. The changed circumstances must not have been contemplated by the court when the decree was entered, and *they must be more or less permanent, not temporary.* They must relate to the welfare of the children. A parent seeking to take custody from the other *must prove an ability to minister more effectively to the children's well being. The heavy burden* upon a party seeking to modify custody stems from the principle that *once custody of children has been fixed it should be disturbed only for the most cogent reasons.*

(Emphasis added.)

In a de novo review the appellate court makes findings of fact anew; however, when considering the credibility of witnesses the court gives weight to the findings of the trial court, but is not bound by them. *In re Estate of Kiel*, 357 N.W.2d 628, 630 (Iowa 1984). The deference we pay to trial court findings is especially strong here. As will appear, the case turns, not so much on what was said and done, as upon the implications of the words and actions of the parties. In resolving such a case a trial court, as first-hand observer of witnesses, holds a distinct advantage over an appellate court, which necessarily must rely on a cold transcript.

II. After an exhaustive study of the trial transcript we agree in all respects with the extensive factual findings of the trial court. To summarize them, the father (Steve) is a thirty-five year old partner in a prominent law firm. The mother (Jan) holds a nursing degree, but has been a full-time mother since the parties separated in 1985. The dispute is over custody of Stevie, the only child of the parties, who was born in 1979.

Stevie was left in Jan's custody when the parties separated. This was after Steve became romantically involved with his legal assistant, Myrna, whom he married in July 1986. Myrna, forty-two, has five children by her prior marriage. They range in age from fifteen to twenty-two. Only the three youngest of these children remain at home. Myrna continues as Steve's legal assistant.

From May of 1985, when Steve left home, until July 1986, when he and Myrna were married, Steve had no real difficulty in arranging to visit with Stevie. But after Steve's marriage to Myrna, Jan undertook a course of conduct regarding Steve's association and visits with Stevie which the trial court aptly described as "appalling." That conduct undoubtedly harmed Stevie and reflects most unfavorably on Jan.

Although it seems she remained in other ways a good mother, Jan used Stevie as a pawn, injecting the child into the very vortex of her pathetic and irrational attempts to draw Steve back to her from Myrna. The outrageous attempts, and Stevie's involvement as a pawn, were constant. They were detailed at length by the trial court.

For brevity we note only the following examples from the trial court's findings:

> On numerous occasions she would bring [Stevie] into conversations between [her] and Steven and indicate to the boy that his father would not do something with him because he no longer loved them or cared for them, that he only loved his new family. Janet indicated to the boy that his father is possessed by the devil and that is the cause of many of their problems. She indicated to [Stevie] that Myrna is either the devil or possessed by the devil which has created a fear in the boy.

On many occasions Jan had Stevie call Steve and leave messages on the telephone tape recorder. For example, on one occasion Stevie said, "Dad, you said you were divorcing Myrna; when are you going to divorce Myrna and come home?" On another occasion the following message was left, "Myrna, I think you are a whore." On another occasion Stevie said, "Dad, I don't ever want to see you again unless Myrna is gone."

Despite these statements, Stevie has a good relationship with Myrna. It is crystal clear from the record that Stevie was speaking at the behest of his mother in making these remarks concerning Myrna.

These examples are from a multitude. The reference to the devil was not a casual one. Jan, who takes her fundamentalist religion very seriously, sincerely believes in demonic presence, a matter which was the subject of considerable testimony. We emphasize that we in no way criticize her for her beliefs but point them out to explain the seriousness of her implication of Stevie in her continuing struggle with Steve. Stevie, who is a student in a private Christian school, was undoubtedly troubled by Jan's accusation that Steve was possessed.

There is a profound legal significance in Jan's conduct. The legislature has made a societal judgment that we must weigh Jan's conduct in considering Steve's application. Iowa Code section 598.41 (1989) lists a number of directives to guide courts in child custody determinations. The statute is of relatively recent vintage. First enacted in 1982, it was amended in 1984 to provide, in material part:

> The court shall consider the denial by one parent of the child's opportunity for maximum continuing contact with the other parent, without just cause, a significant factor in determining the proper custody arrangement.

1984 Iowa Acts ch. 1088, §§ 2–5. Jan's flagrant and continuing interference with Stevie's opportunity to associate with his father was in clear violation of the social precept mentioned in the statute. We are bound to consider it.

Jan argues that her conduct is explainable. She contends she was extremely distraught over the collapse of her marriage and should not be expected to comport herself in a detached manner. More than this, she states she cannot be blamed for failing to fully realize that Steve would not reconcile with her because, she says, Steve was signaling her that he might. To some small extent, the record bears out Jan's claim that Steve held out a glimmer of hope that their marriage might be saved. Jan's extensive testimony of this is in part supported by her clergyman. He met briefly with Steve and Jan shortly after Steve's marriage to Myrna. At that time, according to the clergyman, Steve told Jan he would probably like to come home more than she wanted him to.

Steve insists he never gave Jan any reason to believe their marriage could be saved or reinstituted, that Jan simply misread his attempts to treat her with a measure of kindness. The trial court did not resolve this conflict of evidence; it merely held that no conduct of Steve justified the outrageous conduct of Jan.

Again there is a remarkable aptness in the trial court's observation. Under all the circumstances Jan had no reasonable basis to believe she could lure Steve out of his second marriage. Obviously she was unrealistic in her observations and made the attempt anyway. But, even if she had been given a reason to hope for a resumption of her marriage, her conduct in seeking a resumption was unjustified.

Jan made a dramatic announcement at the proceedings. She said she has at last come to realize Steve would not return to her. She conceded her conduct was wrong, apologized for it, and pledged she would cooperate with Steve's future visitations. Needless to say, Steve views this eleventh-hour conversion with unabashed skepticism, coming as it did after voluminous testimony of Jan's conduct. But the testimony did prompt the trial court to decide for Jan. Stating it was the most difficult case in its experience, the court held that Jan's admission and pledge tipped the scales in her favor.

Evidence aside from Jan's conduct toward Steve's visitations leaves the case in near equipoise. Both parents seem to enjoy an excellent relationship with Stevie, who loves and is deeply loved by them both. Each parent has many pluses and few minuses. Myrna too seems to have built a warm relationship with Stevie, remarkable under these difficult circumstances. Two clinical psychologists, one court appointed, testified in favor of Steve. Neither had any real criticism of Jan, aside from the behavior previously mentioned. Stevie states a preference to remain with his mother.

To sum up, beyond the general testimony of her fitness, certain factors favor Jan. One of these is that this is a modification application and Steve bears the heavy burden to establish the change of circumstances we have mentioned. A second factor in Jan's favor is the deference we accord the trial court. Deference in this case is especially strong for the reasons we have mentioned and because of this experienced and able trial court's clear grasp of the case. We do not scale down that deference because the trial court observed the question was almost too painfully close to call. We also weigh Stevie's stated preference to remain with his mother but are not controlled by it. Iowa Code § 598.41(3)(f).

Beyond the general testimony of his fitness, the main factor favoring Steve is Jan's outrageous conduct. Though not conclusive it is a formidable one. It is formidable because the legislature has re-

quired it to be. It is formidable also because, even accepting Jan's explanations, apology, and pledge, it remains outrageous and reflects adversely on her qualifications to be the custodial parent.

Taking these matters altogether we conclude that joint custody should be retained with primary physical custody being awarded to Steve. It is so ordered. Steve's obligation for child support is terminated with the filing of this opinion.

Visitation should be allowed Jan in accordance with the schedule fixed by the court of appeals: she shall have visitation the first and third weekends of each month from 9:00 a.m. Saturday through 7:00 p.m. Sunday; and each year from 9:00 a.m. July 1 through 7:00 p.m. July 31; and from 9:00 a.m. December 25 of one year to 12:00 noon January 1 of the next year.

DECISION OF COURT OF APPEALS AFFIRMED; TRIAL COURT JUDGMENT REVERSED AND REMANDED.