# IN THE COURT OF APPEALS OF IOWA

No. 15-0224
Filed September 23, 2015

**JOHN K. SUSIE,**
    Plaintiff-Appellee,

**vs.**

**MARILYN TEJEDA,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Plymouth County, Mary Jane Sokolovske, Judge.

Marilyn Tejeda appeals the district court's order and ruling awarding John Susie physical care of their child. **AFFIRMED.**

Zachary S. Hindman of Bikakis, Mayne, Arneson, Hindman & Hisey, Sioux City, for appellant.

John S. Moeller of John S. Moeller, P.C., Sioux City, for appellee.

Considered by Doyle, P.J., and Mullins and Bower, JJ.

**DOYLE, Presiding Judge.**

Marilyn Tejeda appeals the district court's order awarding John Susie physical care of their child. Upon our de novo review, we affirm.

### I. Background Facts and Proceedings.

John and Marilyn are the parents of D.K.S., born in 2008. The parents and child lived together after the child's birth. In approximately 2009, John became a stay-at-home dad and was the child's primary caregiver. John and Marilyn separated in 2012, and the child continued to reside with John, with Marilyn having overnight visitation on her days off, generally two days a week.

The parents were able to co-parent effectively until late 2013, when John began dating another woman. Marilyn stopped talking to John in person, and she said negative things about John to their child. Ultimately, John in November 2013 filed his petition in district court to establish child custody and visitation. John sought placement of the child in his physical care; Marilyn sought placement of the child in her physical care or alternatively, joint physical care.

Trial commenced in October 2014. John and Marilyn both testified, but their testimony conflicted in many instances, such as why Marilyn shaved their child's head, why Marilyn refused to communicate verbally with John, who called the other names in front of their child, and what happened when Marilyn was dropping the child off at John's and an argument between the parties occurred. Concerning the latter issue, Marilyn had previously alleged at the temporary custody hearing that John had assaulted her during the argument, causing her to miscarry a child. At trial, she was unable to provide any medical documentation concerning the alleged miscarriage, though she claimed to have gone to a doctor

for care. When asked on cross-examination if she had lied, Marilyn simply responded, "Can we continue talking about [D.K.S.], please?"

Following the trial, the district court entered its order and ruling placing the child in the parties' joint legal custody and John's physical care, with Marilyn having visitation. The court found shared physical care was not an option, finding:

> Marilyn in particular has not acted in a manner that would ensure that shared care would work. She has become hostile toward John, his wife, and John's extended family and has generally acted contrary to the concepts that would make shared care successful. She is quite willing to use D.K.S. to hurt John, as was the case in repeatedly shaving D.K.S.'s hair when asked not to in anticipation of special events. She has also been willing to make derogatory remarks to D.K.S. about John.

Ultimately, the court found Marilyn's credibility "questionable," noting many of her allegations "could have easily been substantiated by her if the events claimed had occurred." The court granted Marilyn visitation, allowing her one overnight visit every Tuesday night and every other weekend with the child.

Marilyn now appeals. She contends she should be awarded primary physical care of the parties' child or, alternatively, the parties should be awarded joint physical care of the child. Marilyn also asserts in the alternative that if her physical care requests are denied, the decree should be modified to award her increased visitation. We address her arguments in turn.

## II. Discussion.

We review child custody and physical care disputes de novo. Iowa R. App. P. 6.907; *see also In re Marriage of Hynick*, 727 N.W.2d 575, 577 (Iowa 2007). Despite our de novo review, we give strong consideration to the district

court's fact findings, especially with regard to witness credibility. *Hynick*, 727 N.W.2d at 577; *see also* Iowa R. App. P. 6.904(3)(g). This is because the trial court, in making its credibility assessment, has the distinct advantage of listening and observing each witness's demeanor firsthand, while we must rely on a cold transcript. *See In re Marriage of Udelhofen*, 444 N.W.2d 473, 474 (Iowa 1989); *In re Marriage of Vrban*, 359 N.W.2d 420, 423 (Iowa 1984). The first and foremost consideration in child custody cases "is the best interest of the child involved." *In re Marriage of Weidner*, 338 N.W.2d 351, 356 (Iowa 1983); *see also* Iowa R. App. P. 6.904(3)(o).

### A. *Physical Care.*

"Physical care" is "the right and responsibility to maintain a home for the minor child and provide for routine care of the child." Iowa Code § 598.1(8) (2013). If joint physical care is awarded, "both parents have rights to and responsibilities toward the child including, but not limited to, shared parenting time with the child, maintaining homes for the child, [and] providing routine care for the child." *Id.* § 598.1(4). Even though the parties disagree on some matters, these problems should be able to be resolved to the benefit of the children. *See In re Marriage of Gensley*, 777 N.W.2d 705, 716 (Iowa Ct. App. 2009).

In determining whether to award joint physical care or physical care with one parent, the district court is guided by the factors enumerated in section 598.41(3), as well as other nonexclusive factors enumerated in *In re Marriage of Winter*, 233 N.W.2d 165, 166-67 (Iowa 1974), and *In re Marriage of Hansen*, 733 N.W.2d 683, 696-99 (Iowa 2007) (holding that although section 598.41(3) does not directly apply to physical care decisions, "the factors listed [in this code

section] as well as other facts and circumstances are relevant in determining whether joint physical care is in the best interest of the child"). Although consideration is given in any custody dispute to allowing the children to remain with a parent who has been the primary caretaker, *see Hansen*, 733 N.W.2d at 696, the fact that a parent was the primary caretaker of the child prior to separation does not assure an award of physical care. *See In re Marriage of Toedter*, 473 N.W.2d 233, 234 (Iowa Ct. App. 1991). The ultimate objective of a physical care determination is to place the children in the environment most likely to bring them to healthy physical, mental, and social maturity. *In re Marriage of Murphy*, 592 N.W.2d 681, 683 (Iowa 1999); *In re Marriage of Courtade*, 560 N.W.2d 36, 38 (Iowa Ct. App. 1996). As each family is unique, the decision is primarily based on the particular circumstances of each case. *Hansen*, 733 N.W.2d at 699.

In this case, it is clear the district court's findings turned on its assessment of the credibility of the witnesses, or, more specifically, its finding that Marilyn was not credible. Upon our de novo review of the record, we defer to the district court's credibility findings and reach the same conclusion.

At the earlier temporary-custody hearing, Marilyn made serious allegations against John, including that he had previously assaulted her and caused her to have a miscarriage, which John denied. During discovery, John requested information concerning Marilyn's allegations, including specific details and medical records. Her answer to the related interrogatory stated that "a few days after John physically abused [her]," she went to the emergency room concerning the altercation, and then, a few days after that, she

> started bleeding heavily accompanied by a little pain. [She] waited a couple of days to see if it would stop and it didn't. That was when [she] went back to [the hospital]. They took blood and gave [her] a urine pregnancy test. Both of the those tests came back negative that [she] was pregnant and the doctor told [her that she] lost the pregnancy.

Marilyn did provide an initial record of going to the emergency room, which only stated she presented with "complaints of having [a] slip and fall," having "[f]ell against her left shoulder and arm," and "she [thought] she could be pregnant." However, she provided no record showing that she was pregnant or that she went to the doctor thereafter and was told she had a miscarriage. That she was able to provide medical documentation for her first visit but not her claimed second visit is telling, particularly in light of her cross-examination answers to questions concerning the alleged miscarriage, as well as other topics she did not wish to discuss, seeking to change the subject instead of giving substantive answers. Her refusal to provide answers substantially diminishes her credibility.

Additionally, Marilyn admitted to committing certain actions, such as entering John's home without permission on one occasion, wherein she put all of his underwear in the hamper and filled the hamper with water, as well as sending John vulgar text messages out of anger. She admitted she talked badly about John in front of the child, which the child repeated back to John. She refused to send the child's baseball glove with the child when he returned from a visit with her. Marilyn shaved the child's head on school picture day, testifying she had to do it because the barber John had taken the child to had "cut his hair inappropriately." Yet, the picture supplied by John entered into evidence shows

a normal haircut. Moreover, John specifically asked her not to shave the child's head again, but she did anyway—the week before John's wedding.

Marilyn's lack of credibility coupled with her juvenile behaviors do not lend any support to her other more serious, yet unsubstantiated claims, such as claiming John returned the child to her care with bruises and restricted her interaction and visitation with the child, among other things. John admitted at trial he had denied Marilyn the opportunity to talk with the child on one occasion—when she called during his wedding rehearsal dinner, which she knew was going on. More than anything, the record evidences Marilyn's use of the child as a pawn and putting the child directly in the middle of the parties' conflict.

The overwhelming evidence at trial was that joint physical care was not a viable option. While we believe both parties love and care for their child, John has been the child's primary caregiver for most of his life. Though John is not a perfect parent—no such parent exists—we agree with the district court that the child's continued placement in John's primary care was the environment most likely to bring the child to a healthy physical, mental, and social maturity. Consequently, we affirm the district court's physical care placement of the child with John.

### B. *Visitation*.

Marilyn alternatively argues that the district court did not give her maximum visitation as required under Iowa Code section 598.41(1)(a), arguing the court should have granted her visitation when John was at work, and at a minimum, should have kept the temporary visitation schedule in place. In the temporary order, the court awarded Marilyn visitation generally "every Tuesday

from 8:00 a.m. until Wednesday at 7:00 a.m." and "every other weekend from 5:00 p.m. on Friday until Sunday at 8:00 p.m." In the final order, the court changed Marilyn's visitation hours to "every Tuesday from 6:00 p.m. until Wednesday at 7:00 a.m." and every other weekend from "5:00 p.m. on Friday until 6:00 p.m. on Sunday."

"In establishing visitation rights, our governing consideration is, once again, the best interest of the children." *In re Marriage of Stepp*, 485 N.W.2d 846, 849 (Iowa Ct. App. 1992). Generally, liberal visitation serves children's best interests. *Id.* Although section 598.41(1)(a) directs courts to reach a custody determination with liberal visitation that "will assure the child the opportunity for the maximum continuing physical and emotional contact with both parents," that directive is in the context of what "is reasonable and in the best interest of the child."

Here, having reviewed the record de novo, we conclude the visitation schedule ordered by the district court is both reasonable and in the best interests of the child. In the parties' pretrial stipulation, both parties noted they were seeking physical care of the child and requesting the other parent have the child every other weekend plus alternating holidays. The visitation granted by the court was more than John requested, in that the schedule permitted Marilyn an overnight visit during the week in addition to every other weekend. Though the court's final schedule effectively reduces the total number of hours of Marilyn's visitation with the child, given their child's school-age, the changes are in the child's best interests. The temporary order setting weekly visits for Tuesdays at 8:00 a.m. does not seem workable, given that for most of the year, the child will

be in school at that time. Changing it to 6:00 p.m. allows the child to come home and get ready before Marilyn's visit, as well as participate in sports after school or finish homework. Similarly, the minimally shortened Sunday visit every other week permits the child time to return home with time to eat dinner and to finish homework. Given the child's age, we find the schedule to be in the child's best interests. We note that the parents are free to change the visitation schedule if they are able to reach an agreement.

Furthermore, this court expects the parties will follow through with the current court-ordered parenting schedule and facilitate a healthy and nurturing environment for their child. We remind the parents that "[e]ven though [they] are not required to be friends, they owe it to [their] child to maintain an attitude of civility, act decently toward one another, and communicate openly with each other." *In re Marriage of Grantham*, 698 N.W.2d 140, 146 (Iowa 2005); *see also In re Marriage of Crotty*, 584 N.W.2d 714, 716 (Iowa Ct. App. 1998) ("Iowa courts do not tolerate hostility exhibited by one parent to the other."). It is time for the parents to put their child first and work together as grownups for the best interests of everyone, and we trust they understand the importance of showing respect for one another as they continue their joint-parenting venture.

### *III. Conclusion.*

For the foregoing reasons, we affirm the district court's order and ruling placing the parties' child in John's physical care and setting the aforementioned visitation schedule.

**AFFIRMED.**