# IN THE COURT OF APPEALS OF IOWA

No. 17-1849
Filed September 12, 2018

IN RE THE MARRIAGE OF ELIZABETH HOPE JENSEN
AND NOAH MATTHEW JENSEN

Upon the Petition of
**ELIZABETH HOPE JENSEN, n/k/a ELIZABETH HOPE STULGIES,**
Petitioner-Appellee,

And Concerning
**NOAH MATTHEW JENSEN,**
Respondent-Appellant.

_____

Appeal from the Iowa District Court for Pottawattamie County, Richard H. Davidson, Judge.

Noah appeals from the decree dissolving his marriage to Elizabeth, which modified custody and child support provisions in the parties' separate maintenance decree. **AFFIRMED.**

Meghan E. Wolf of Cordell Law, LLP, Omaha, Nebraska, for appellant.

Michael J. Winter of Law Offices of Michael J. Winter, Council Bluffs, for appellee.

Considered by Danilson, C.J., and Vogel and Tabor, JJ.

**VOGEL, Judge.**

Noah Jensen appeals from the decree dissolving his marriage to Elizabeth (Beth) Stulgies, which modified certain provisions contained in the parties' separate maintenance decree. Noah argues the district court acted improperly by treating the petition as a modification, finding a substantial change in circumstances, modifying the custody and care provisions to award joint legal custody and physical care to Beth, and ordering him to pay child support. He also contends the district court should not have found Beth and her witnesses credible, failed to give proper weight to his expert witness, and decided the issues based on religious grounds. We agree with the court's treatment of the petition as a modification and its determinations of witness credibility, and we find the court did not improperly consider religion. We also agree Beth showed a substantial change in circumstances warranting modification, and we agree with the court's awards of joint legal custody, physical care, and child support. Finally, we award appellate attorney fees to Beth.

## I.     Background Facts and Proceedings

Beth and Noah were married in 2005. They have two children together, a son, born in 2007, and a daughter, born in 2010. At the time of their marriage, they were both members of Word Center Ministries (Word Center), a bible study group primarily run by Noah's parents, Sharon and Rod Jensen.[1]

---

[1] Noah and his mother testified Word Center had no "members" and people were free to come and go from the group. However, Beth and her witnesses testified Word Center had "members" who were isolated from non-members. Like the district court, we accept the testimony of Beth's witnesses and refer to the group's "members," regardless of the terminology Noah and his family use.

The children's primary caretaker during the marriage was Beth, who also homeschooled the children. In December 2015, Beth was hospitalized for two days after being found unresponsive. She testified she was taking multiple medications for rheumatoid arthritis and sleep problems and she believed her condition was due to a bad reaction to her medications. Following her release, Beth handwrote and signed a document stating she had mentally and physically abused her children and they "need to be in the care of someone" safe, specifically Sharon. At trial, she denied abusing her children and testified she wrote the note "confessing my sins" under orders from Noah and Sharon because she feared she would never see her children again if she refused.

Noah filed a petition for separate maintenance. According to him, he filed for a legal separation because he wanted the chance to work things out with Beth in the future. She testified "he could not divorce me because Biblically . . . I did nothing to him" and "I'm not the one that cheated on him." She signed a stipulation and agreement that granted him sole legal custody and physical care of the children, restricted her to supervised visitation, and required her to pay child support. On February 29, the district court entered an order approving the stipulation in the form of a decree.

On May 18, 2016, Beth filed a document captioned "Petition for Dissolution of Marriage," which sought a divorce and determinations of custody and care of the children. Her petition asserted she was not represented by counsel at the time she agreed to the terms of the separate maintenance agreement and she believed Noah intended to move the children to Tennessee to keep them away from her. At trial, she testified she signed the stipulation because she feared she would

never see her children again if she did not do what Noah and his family wanted. In response to the petition, Noah filed a motion in limine on May 26, which sought to exclude all of the issues previously decided in the separate maintenance decree. On June 24, the district court entered an order for temporary custody altering the terms of the stipulation and agreement as it related to Beth's visitation and appointed a guardian ad litem for the children. A trial was held on Beth's petition on June 2, 2017. On October 10, the district court filed a decree of dissolution that dissolved the marriage and modified the separate maintenance decree to order joint legal custody of the children with physical care to Beth, liberal visitation to Noah, and $693.00 per month in child support payments from Noah to Beth. Noah appeals.

## II. Standard of Review

We review actions for dissolution of marriage or modification of child care or custody de novo as they are heard in equity. *In re Marriage of Hoffman*, 867 N.W.2d 26, 32 (Iowa 2015) (modification); *In re Marriage of McDermott*, 827 N.W.2d 671, 676 (Iowa 2013) (dissolution). "Although we make our own findings of fact, 'when considering the credibility of witnesses the court gives weight to the findings of the trial court' even though we are not bound by them." *Hoffman*, 867 N.W.2d at 32 (quoting *In re Marriage of Udelhofen*, 444 N.W.2d 473, 474 (Iowa 1989)). When considering a modification of child care or custody, our controlling consideration is the best interests of the children. *Id.* A party who seeks a modification of child care of custody must establish by a preponderance of the evidence that there has been a material and substantial change in circumstances

since the entry of the decree. *In re Marriage of Frederici*, 338 N.W.2d 156, 158 (Iowa 1983).

### III. Motion in Limine

Noah's motion in limine sought to prohibit Beth from litigating the issues and facts agreed to, and ruled upon, in the separate maintenance decree. Regarding the issues, Iowa law allows spouses to "legally separate by filing a petition for separate maintenance as provided in Iowa Code section 598.28 without dissolving their marriage." *In re Estate of Whalen*, 827 N.W.2d 184, 185 n.1 (Iowa 2013) (citing 2 Marlin M. Volz, Jr., *Iowa Practice Series, Methods of Practice* § 31:31, at 869 (2012)); *see* Iowa Code § 598.21(1) (2015) (prefacing provision on disposition of property with, "Upon every judgment of annulment, dissolution, or separate maintenance, the court shall divide the property of the parties . . . ."). Section 598.41, which deals with child custody, applies when "the parents have separated or dissolved the marriage." Iowa Code § 598.41(1)(a); *see also id.* § 598.21B(2)(a) (outlining the court's authority to order child support, "upon every judgment of annulment, dissolution, or separate maintenance"). Accordingly, the provisions contained in the decree that determined child custody, physical care, and child support were final orders aptly positioned for appeal or modification. *See*, *e.g.*, *In re Marriage of Thielges*, 623 N.W.2d 232, 235–39 (Iowa Ct. App. 2000) (considering a modification of physical care and visitation); *see also* Iowa Code § 598.21C (allowing modification of child support).

The district court was tasked with dissolving the parties' marriage and issuing a dissolution decree. Had Beth not raised the issues surrounding child custody, the court could have simply incorporated the provisions contained in the

separate maintenance decree. But because Beth's petition for dissolution raised the issues of child custody, physical care, visitation, and child support, the district court considered it to be a petition for modification. *See Meier v. Senecaut*, 641 N.W.2d 532, 539 (Iowa 2002) ("[W]e treat a motion by its contents, not its caption."); *Jones v. Iowa State Highway Comm'n*, 207 N.W.2d 1, 2 (Iowa 1973) ("We therefore disregard the misleading manner in which plaintiffs entitled their suit . . . ."). Moreover, Noah answered Beth's petition by counterclaiming for "sole temporary and permanent care, custody and control of the minor children" and "supervised visitation" for Beth. Therefore, his complaint that Beth did not correctly petition the court to modify the prior custody, visitation, and support arrangement is unsustainable. *See In re Marriage of Blessing*, 220 N.W.2d 599, 605 (Iowa 1974) (holding wife's cross-petition, which raised the same issues as the husband's motion, rendered her complaint about the pleadings untenable). Accordingly, the district court properly treated Beth's petition as a modification of the separate maintenance decree along with the requested dissolution of the marriage.

Regarding the facts, Noah argues the court should have excluded evidence arising prior to entry of the separate maintenance decree. The district court has broad discretion in deciding whether evidence has sufficient probative value for admission. *See* Iowa R. Evid. 5.403; *Thielges*, 623 N.W.2d at 239–40 (citing the predecessor to rule 5.403). Having determined Beth's dissolution of marriage petition included a modification of the separate maintenance decree, she needed to show a substantial change in circumstances occurred. *See Frederici*, 338 N.W.2d at 158. Showing such change logically requires establishing the facts as

they existed to warrant entry of the original separate maintenance decree. The record made prior to the entry of the separate maintenance decree contains little evidence of the facts or "circumstances" the court relied upon when entering that decree. Accordingly, the dissolution/modification court refused to exclude evidence merely because it arose prior to, and therefore in support of, the entry of the separate maintenance decree. By allowing evidence that pre-dated the separate maintenance decree, both parties were able to establish the facts that lead to the entry of that decree and then prove or refute a "substantial change of circumstances." We find no abuse of discretion in this decision.

## IV. Witness Credibility

Before we discuss the district court's reasoning and decision on custody issues, we address Noah's contentions that his witnesses were more credible than Beth's witnesses. Good reasons exist for us to give close consideration to the district court's assessment of the credibility of witnesses. *In re Marriage of Vrban*, 359 N.W.2d 420, 423 (Iowa 1984). The district court "is greatly helped in making a wise decision about the parties by listening to them and watching them in person." *Id.* The court heard testimony from several witnesses during trial and was able to observe their demeanor first-hand. Beth presented testimony from her mother and father; Melissa Pennington, an acquaintance from Word Center; and Adam Jensen, Noah's estranged brother. The court specifically found "all four of these witnesses credible." Noah's witnesses included Jack Dross as an expert, and the court summarized his testimony and its findings thusly:

> Noah called Jack Dross, as an expert that has been counseling both [children]. Mr. Dross has met both Noah and Sharon Jensen as part of his counseling efforts with the children. He was

provided a copy of Beth's confessions that she has since recanted. It is unclear if he reviewed the child abuse assessment. He has not met with Beth and admitted that his testimony may have been different if he had. He was called as an effort to vouch for the children but when testifying that he believed [the daughter] had been bribed or threatened to write a note in support for her mother he could not recall whether the child was promised a toy or threatened with punishment. The court found Mr. Dross' testimony neither persuasive nor helpful. The court further notes Noah should have informed Beth the children were in counseling.

The district court was able to hear all witness testimony first-hand and make credibility determinations based on witness demeanor and its other observations. Noah presents several arguments to us as to why his witnesses are more credible than Beth's witnesses, and he was able to make the same credibility arguments to the district court. *See Hoffman*, 867 N.W.2d at 32. While we conduct a de novo review, we give weight to the district court's factual findings and see no reason to find Beth's witnesses non-credible. Accordingly, we generally agree with the court's determinations of credibility and assignments of weight regarding witness testimony.

### V. Religion

Noah next argues the district court held his religious beliefs against him. Noah has the constitutional right to practice the religion of his choosing. *In re Marriage of Decker*, 666 N.W.2d 175, 179 (Iowa Ct. App. 2003) (citing *In re Marriage of Anderson*, 509 N.W.2d 138, 141 (Iowa Ct. App. 1993)). "It would be unconstitutional for us to put any restraint on the exercise of either of these parties' religious freedom." *Id.*

Noah does not point to any specific religious beliefs he claims the court discriminated against, other than his association with Word Center. He testified

that he identifies as Christian, that he attends a Baptist church, and that Word Center is not a religion but is simply "a ministry that offers Bible study help."

In its decree, the district court stated: "The court respects Noah's, and his family's, choice of religion and has not considered the religious study at Word Center Ministries. What the court does consider however, is the attitude displayed by Noah and his parents toward those that leave the group." Beth and her witnesses testified consistently and extensively about the actions Noah and his family took to isolate Word Center members from non-members. Noah does not claim this isolation is associated with his religious beliefs, and he denied anything bad would happen when someone left the Word Center. As explained below, the district court considered the best interests of the children—and not Noah's religious beliefs and practices—in determining physical care, custody, and child support. We also do not consider his beliefs a factor in weighing against Noah's claims in our de novo review. Accordingly, we conclude the district court did not improperly consider religion in its dissolution decree.

### VI.     Change in Legal Custody and Physical Care

Noah next argues Beth did not make the required showing to warrant a change in child custody and care. The party seeking to modify a custody and care arrangement bears a heightened burden and we will modify the arrangement only for the most cogent reasons. *See Dale v. Pearson,* 555 N.W.2d 243, 245 (Iowa Ct. App. 1996). Generally, the party requesting modification must make two showings: (1) a substantial change in material circumstances that is more or less permanent and affects the children's welfare; and (2) he or she is able to provide

superior care and minister more effectively to the children's needs.  *In re Marriage of Harris*, 877 N.W.2d 434, 440 (Iowa 2016) (citing *Frederici*, 338 N.W.2d at 158).

### A.    Substantial Change in Circumstances

The district court found Beth established six substantial changes:

> 1. Assuming in February 2016, that Beth was so ill and abusive that she could not be left alone with her children, that is not the case today.  The court doubts there was ever a time Beth should have been so restricted but Noah relied on that suggestion to justify the custody ordered.
> 2. Beth is reunited with her family and [the children] have a relationship with a whole new extended family including grandparents, aunts, uncles and cousins.  Beth allows the children to share a relationship with Adam Jensen and his family as well.
> 3. The weight of the evidence demonstrates Noah and his mother Sharon manipulated and controlled Beth throughout the marriage and certainly at the time of the separate maintenance proceeding.  Beth is no longer under their control and is thinking for herself.
> 4. Beth has recanted her statement referred to at trial as her "confession of sins."  The court finds her testimony credible: she believed she had no choice but to sign the statement if she wanted to see her children.
> 5. Beth is no longer in fear of not seeing her children.
> 6. Beth's overall mental health and behavior has changed.  Melissa Pennington described Beth as somewhat depressed at the time of the separation and now a more independent and happier person.  Ms. Pennington's testimony was echoed by Beth's family and Adam Jensen.

These six changes, none of which were contemplated at the time of the separate maintenance decree, are more than sufficient to show a substantial change in circumstances.  Many of Beth's problems related to a lack of family support around her and isolation she experienced as a member of Word Center, which Beth and other witnesses described as a "cult" controlled by Sharon.  Beth initially joined Word Center with her parents and siblings around 2000, but her family left the group around the time she married Noah.  Her father left the group before her

wedding, and he testified the group threatened to arrest him if he attended the wedding. Her mother testified that if they tried to contact Beth or the children after leaving the group, Beth "would get in trouble, and in trouble meaning she would have meetings upon meetings, days upon days of browbeating meetings." Beth testified why she did not contact her family after they left:

> Once somebody leaves Word Center, you're not allowed to go talk to them. And I understand [Noah's counsel] talked about didn't [I] have a phone, didn't [I] have a car. Yes, I did, but I could have lost my kids. I could have been kicked out, feared that I couldn't go see my family. I'm not allowed back in the church, so I would be left with nothing.

Beth also experienced health issues, including anxiety and rheumatoid arthritis that she treated with medication. She testified Sharon forbade her from taking her rheumatoid arthritis medication and wanted to bury it in a sort of funeral because Sharon believed it was developed from "dead babies." She also testified her December 2015 hospitalization became a "big deal" because Sharon "wanted to know all the medicine that I was on. She was trying to take over my life."

Since Beth left Word Center she has been able to reunite with her family and introduce her children to them and to Adam Jensen and his family. Beth's mother testified that Beth is no longer fearful, as she had been during her time with Word Center, and she is now allowed to think for herself. As a result, Beth is working and enrolled in college courses, which, she testified, she was forced to end at the time of her marriage. Accordingly, a substantial change of circumstances occurred when Beth left Word Center because she is now able to reunite with her family, introduce her children to her family, and pursue a career that was not attainable while she was a member.

### B.     Superior Care

Having shown a substantial change in circumstances, Beth must also show

she could provide superior care to warrant a change in care and custody.  *See*

*Harris*, 877 N.W.2d at 440.  The district court found:

> There are factors that weigh in Beth's favor.  First, the court
> finds if she were awarded primary care the children would spend
> more time with extended family.  Not only would they see Beth's
> parents and siblings more often, Beth made clear she would also
> reunite the children with their uncle and his family.  Noah has a close
> relationship with his parents and will insure they also see the
> children. Interaction with extended family is important for the children
> and they stand a better chance of the contact if Beth were to be
> awarded primary care.
>
> . . .
>
> Beth intends on remaining in the Omaha/Council Bluffs area.
> An award of joint custody with primary physical care with Beth
> coupled with extraordinary visitation with Noah, assuming he
> reconsiders his move, is in [the children's] best interest.  Considering
> this custodial arrangement and weighing all of the factors discussed
> above the court concludes Beth has demonstrated she is able to
> provide superior care.
>
> It is obvious to the court, and irrespective as to what physical
> care determination was made, that Beth and Noah need to learn how
> to better communicate and show mutual respect for each other.  The
> court is satisfied that to foster better communication and mutual
> respect the parties should participate in counseling and will order the
> same.

We agree with the district court's assessment.  Upon our review of the

record, the evidence shows considerable tension between the parties made all the

more difficult because of their inability to communicate.  Beth testified that many

decisions were made according to Sharon's directives, including how Beth was to

discipline her children.  For much of the parties' relationship, Beth was the

children's primary caregiver.  Until she was hospitalized and signed the separate

maintenance agreement, Noah raised no complaints as to the care she provided

for the children.  While she acknowledges the children have sometimes missed

taking medication while in her care, the record does not support his allegations that she abused the children. Moreover, Noah expressed a desire to move to Tennessee to be closer to his mother who had recently moved there. Despite his contention that he will remain in Iowa if the court requires him to do so, the court was satisfied Beth will remain in the Council Bluffs area, near their maternal grandparents and both Noah's and Beth's extended family. Accordingly, we agree with the district court that Beth carried her burden of showing she could provide superior care, warranting a change in the physical care arrangement.

Regarding legal custody, the stipulation and agreement signed by the parties, which granted Noah sole legal custody of the children, does not state "that joint custody is unreasonable and not in the best interest of the child[ren]." Iowa Code § 598.41(2)(b). Likewise, the separate maintenance decree does not provide reasons why sole custody in Noah is in the children's best interests. *See id.*

We agree with the district court that sole custody in Noah is unwarranted. As stated above, the record establishes a substantial change in circumstances—including Beth freeing herself from the control of Noah and Sharon, regaining her ability to think for herself, and reuniting herself and the children with her family and Noah's estranged family members—that warrants modification. The record provides no reason why Beth should not have equal rights and responsibilities in making decisions "affecting the child's legal status, medical care, education, extracurricular activities, and religious instruction." *Id.* § 598.41(5)(b). Accordingly, we agree with the district court that joint legal custody to both parties was appropriate.

**VII. Child Support**

Noah asserts the district court should not have ordered him to pay Beth child support. In its dissolution decree, the district court stated:

> Beth is employed . . . and earns $29,680 annually. Noah is employed . . . and earns $48,161 annually. Based on the parties' annual incomes and applying the Iowa Supreme Court guidelines to the facts of this case and the extraordinary visitation ordered, the Court determines Noah's child support obligation to be $693.00 for two children and $464.00 for one child.

A district court is directed to determine the amount of child support specified by our child support guidelines. *In re Marriage of Powell*, 474 N.W.2d 531, 534 (Iowa 1991). "Although Iowa Code section 598.21(4)(a) provides that the child support amount should be reasonable and necessary, the support award is not limited to the actual current needs of the child but may reflect the standard of living the child would have enjoyed had there not been a dissolution." *Id.* (citing *In re Marriage of Campbell*, 451 N.W.2d 192, 194 (Iowa Ct. App. 1989)). The child support guidelines are to be strictly followed unless their application would lead to an unjust or inappropriate result. *See* Iowa Code § 598.21(4)(a).

Upon our de novo review, we conclude that $693.00 for two children is a reasonable and necessary amount of child support. The award was based on the parties' tax returns and pay stubs, and it was made in conjunction with the child support guidelines.

**VIII. Appellate Attorney Fees**

Noah and Beth also request an award of appellate attorney fees. *In re Marriage of Applegate*, 567 N.W.2d 671, 675 (Iowa Ct. App. 1997). An award of appellate attorney fees is not a matter of right but rests within our discretion. *Id.*

In determining whether to award appellate attorney fees, we consider the needs of the party making the request, the ability of the other party to pay, and whether the party making the request was obligated to defend the decision of the trial court on appeal. *Id.* We decline to award Noah appellate attorney fees. Beth was forced to defend the district court's order and, given the disparity in the parties' income, we award Beth $3000 in appellate attorney fees.

## IX. Conclusion

The district court properly treated Beth's petition as a modification and determined credibility of witnesses, and it did not improperly consider religion. Because Beth proved a substantial change of circumstances and her ability to provide superior care of the children, we affirm the district court's modification, granting Beth physical care of the children and granting the parties joint legal custody. We affirm the modification of child support and award Beth appellate attorney fees.

**AFFIRMED.**