## IN THE COURT OF APPEALS OF IOWA

No. 18-1724
Filed July 3, 2019

IN RE THE MARRIAGE OF CHAD E. DRAKE
AND LAURA A. DRAKE

Upon the Petition of
CHAD E. DRAKE,
        Petitioner-Appellant,

And Concerning
LAURA A. DRAKE,
        Respondent-Appellee.

_____

        Appeal from the Iowa District Court for Ringgold County, Thomas P.

Murphy, Judge.

        Chad Drake appeals the district court's decree dissolving his marriage to

Laura Drake. **AFFIRMED AS MODIFIED AND REMANDED WITH**

**INSTRUCTIONS.**

        Karen A. Taylor of Taylor Law Offices, P.C., Des Moines, for appellant.

        Lisa M. Noble of Noble Law Office, Des Moines, for appellee.

        Considered by Potterfield, P.J., and Doyle and Bower, JJ.

**DOYLE, Judge.**

Chad Drake appeals the district court's decree dissolving his marriage to Laura Drake. He contends the court erred in calculating his income for purposes of determining his child support obligation. He also challenges the amount of the equalization payment the district court determined Laura was due. Upon our review, we affirm as modified and remand to the district court with instructions.

### I. Standard of Review.

We review dissolution actions de novo. *See In re Marriage of Larsen*, 912 N.W.2d 444, 448 (Iowa 2018); *see also* Iowa R. App. P. 6.907. Although we examine the entire record and adjudicate the issues anew, we give weight to the district court's factual findings, especially with respect to the credibility of the witnesses. *See In re Marriage of McDermott*, 827 N.W.2d 671, 676 (Iowa 2013); *see also* Iowa R. App. P. 6.904(3)(g). This is because the district court, in making its credibility assessment, has the distinct advantage of listening and observing each witness's demeanor firsthand, while we must rely on a cold transcript. *See Albert v. Conger*, 886 N.W.2d 877, 880 (Iowa Ct. App. 2016); *In re Marriage of Udelhofen*, 444 N.W.2d 473, 474 (Iowa 1989); *In re Marriage of Vrban*, 359 N.W.2d 420, 423 (Iowa 1984).

### II. Child Support.

"In Iowa, child support is calculated using the child support guidelines." *In re Marriage of Erpelding*, 917 N.W.2d 235, 245 (Iowa 2018); *see also* Iowa Code § 598.21B(1) (2018); Iowa Ct. R. 9.2. "The purpose of the guidelines is to provide for the best interests of the children by recognizing the duty of both parents to provide adequate support for their children in proportion to their respective

incomes." Iowa Ct. R. 9.3(1). Moreover, there is "a rebuttable presumption that the amount of child support which would result from the application of the guidelines prescribed by the supreme court is the correct amount of child support to be awarded." Iowa Code § 598.21B(2)(c).

"To compute the guideline amount of child support," the district court must first compute the adjusted net monthly income of each parent. Iowa Ct. R. 9.14. That amount is determined by first determining each parent's gross monthly income. *See* Iowa Ct. R. 9.14(1). Under the guidelines, "'gross monthly income' means reasonably expected income from all sources." Iowa Ct. R. 9.5(1). The court must determine a parent's income from the most reliable evidence presented. *See In re Marriage of Powell*, 474 N.W.2d 531, 534 (Iowa 1991).

On appeal, Chad insists the court erred when it determined he made an additional $45,000 annually through his farming operation. At trial, Chad testified that, in addition to his full-time job managing two pig nurseries for Iowa Select Farms, he also does "a little farming on the side," explaining:

> I have twenty-seven cows; and I do sixty-three crop acres of my mom's ground. So it doesn't take up a lot of time. The fall and the spring are a little bit busier than the rest of the year. It's more of a hobby anymore than it really is a job.

Chad claimed that "he carrie[d] about $150,000 worth of farming debt each year" and that debt and other expenses dissipated any farm income. Laura testified she did not believe Chad's farm was just a hobby because "he's in it to make money."

After reviewing the evidence and hearing the parties' testimony, the court did not find Chad to be particularly credible, noting, among other things, that "Chad played a bit fast and loose with his financial affidavit." It found "[m]uch of Chad's

testimony was self-serving." Although the court acknowledged it was within its discretion to deduct depreciation and expenses from Chad's farm income, the court did not believe the expenses should be deducted. The court found the expenses claimed on tax returns primarily consisted of depreciation and did not show any other significant expenses. Additionally, the court noted Chad's exhibits showed Chad as having a running checking account balance of around $4000; however, "Laura's exhibits showed Chad consistently ran a much higher balance, anywhere from $17-$40,000." "Given Chad's rolling bank account balance, and what appeared to the court to be his business savvy and drive regarding farming," the court found Chad's claimed farm expenses should not be deducted from his farming income" and determined Chad earned $45,000 annually through his farm operation. The district court further noted that it believed the amount of the child support award was the correct one, even if it calculated Chad's income incorrectly, "based on what it perceives to be a hardship" and that "a deviation would otherwise be in order."

While we cannot disagree with the district court's assessment that Chad played fast and loose with his financial affidavit, we do disagree with the court's observation that Chad's farming expenses consisted of primarily depreciation and that his tax schedules did not show significant other expenses. In computing Chad's child support obligation, the court did not subtract any farm expenses from Chad's farming income. Chad's Schedule F's for the years 2013 through 2017 showed significant expenses other than depreciation. To be sure, the depreciation figures are stunning and, except for one year, depreciation significantly exceeded farm income each year. Just deducting the farm expenses from farm income show

Chad's farming operation was essentially a break-even proposition. Chad's farm income averaged about $43,800 per year over five years, and the farm expenses averaged about $40,700 per year. So, over a five-year period, Chad's annual net farm profit averaged about $3100 sans depreciation.

The child support guidelines define "net monthly income" as gross monthly income less specifically enumerated deductions. *See* Iowa Ct. R. 9.5. The guidelines do not specifically provide for a deduction for depreciation expenses, but the Iowa Supreme Court has determined "depreciation should not categorically either be deducted as an expense or treated as income, but rather that the extent of its inclusion, if any, should depend on the particular circumstances of each case." *In re Marriage of Gaer*, 476 N.W.2d 324, 328 (Iowa 1991). As the court observed:

> Depreciation is a mere book figure which does not either reduce the actual dollar income of the defendant or involve an actual cash expenditure when taken. On the contrary, it represents additional cash available to the defendant by permitting substantial tax deductions and, ultimately, tax savings. The fact that the defendant may use some or all of the cash represented by depreciation to pay off principal indebtedness on the property is of no consequence since such payments, in effect, increase his net worth and estate by increasing his equity.

*Id.* (quoting *Stoner v. Stoner*, 307 A.2d 146, 152 (Conn. 1972)). Under circumstances similar to the present case, we have found

> it unacceptable as a matter of public policy to allow a person in [respondent's] position to generate paper losses which are then deducted from his primary income in order to avoid paying child support as determined by the child support guidelines. We are not required to give any consideration to those "business expenses reasonably necessary" to maintain a farming operation which is neither a business nor an occupation, but is instead a hobby or a tax shelter.

*In re Marriage of Starcevic*, 522 N.W.2d 855, 856-57 (Iowa Ct. App. 1994).

We have neither the record nor the resources to compute reasonable depreciation for Chad's farming operation under the straight-line method or any other method. Nevertheless, under the unique circumstances and facts relevant to the issue of child support, we believe a deduction for depreciation should not be allowed as the primary interest is the best interests of the children. *See In re Marriage of McKenzie*, 709 N.W.2d 528, 533-34 (Iowa 2006). The district court properly refused to consider depreciation in determining Chad's income for child support purposes.

A more difficult question is whether the district court erred in refusing to consider farm expenses in determining Chad's income for child support purposes. In its ruling on Chad's motion to reconsider, amend, or enlarge, concerning the child support issue, the court stated:

> The court applied the child support guidelines using the total farm income, and the court still believes that is appropriate. Depreciable and perhaps other expenses on the parties' tax returns may have included (for example) payment and repairs for a truck that is used in more than just farming. The court factored (for child support) farming income including amounts which would normally be deducted for federal and state taxes from employee income. Thus, the court did use a net, and not gross amount for farm income.
> The court believes that if it deducted what it feels were necessary farm expenses, instead of employee related taxes, Chad might pay more in child support. The court exercised its discretion and awarded child support based on a fair and equitable assessment of Chad's income.

"Legitimate business expenses may be deducted from income for purposes of determining child support." *In re Marriage of Hansen*, 886 N.W.2d 868, 876 (Iowa Ct. App. 2016) (citing *Gaer,* 476 N.W.2d at 329 ("[S]ome consideration must be given to business expenses reasonably necessary to maintain the business or

occupation.")). Other than the expenses for the pickup truck that was used for more than just farming, there is no challenge to Chad's farm expenses. Furthermore, Laura makes no argument that Chad cannot deduct his farm expenses for purposes of determining his income for child support purposes. We conclude Chad's farm expenses should have been deducted from his farm income for purposes of calculating his child support obligation.

Averaging farm income may be appropriate in calculating child support. *See In re Marriage of Knickerbocker*, 601 N.W.2d 48, 52 (Iowa 1999). Deducting farm expenses from farm income averaged over the five-year period from 2013 to 2017 results in net annual farm income of $3100. We find that average should have been used as Chad's annual farm income, and we therefore must remand the case back to the district court for recalculation of Chad's child support obligation under the guidelines while accounting for $3100 annual income attributed to Chad's farming operation.

### III. Property Equalization Payment.

Laura and Chad married in 2006 and separated in 2017. Both worked outside the home. Laura worked two jobs at times. As discussed above, Chad had a farming operation in addition to his employment. At the time of trial, Chad was renting eighty acres from his mother, and there he grew row crops and raised cattle. He also rented another forty acres from another individual. He paid a person to put in his crop and harvest it. At the time of trial, Chad owned a bull, some twenty-seven cows, and twenty-three calves. A few of the cows were still pregnant. Chad's financial affidavit shows he owned about $66,000 in farm

equipment—although none of it was appraised. It appears that all of his farm assets are encumbered.

During the course of the marriage, the couple purchased Chad's grandfather's farm. They sold it a few years later, in 2013, making a profit of $108,000. Chad testified the money

> went to paying off some of the other farm debt, because I did have several loans for cattle at the time, some machinery at that time, through FSA.
> I also owed my [grandfather], oh, between I think twenty— around $25,000. He did pay a farm payment for me until I—I got the farm sold. So roughly $25,000 went right back to him.
> I paid off the vehicle that Laura was driving at the time.
> So all in all, when all of that was said and done, I didn't really have much left.

Chad had no verification that the farm sale funds were applied to debt.

During the course of the marriage, the parties had separate bank accounts and split the payment of bills. Laura paid the rent for their home, the utilities, and the bulk of the groceries for the family. Laura did the laundry, the grocery shopping, the cooking, and was the primary care giver for the children. After she broke her back at work, Laura received a workers' compensation settlement of about $50,000. She "paid off a lot of debt" with the proceeds and bought the kids some clothes and paid rent.

Chad paid for the internet, cable TV, telephone, and car insurance. Chad routinely took the parties' tax refunds and deposited them in his account where they "always made [their] way back to the farm somehow." Chad sold a farm implement for $49,000 and deposited the money in his account; he lived off that money for several months, paying bills, going on vacation by himself, and purchasing bowling and golf items. Chad bowled weekly in the winter and golfed

weekly during the season. He owns a golf cart with another person and pays rent for a building at the golf course to store the cart. He also hunts and fishes. As Chad summed it up, "Me and my wife have lived separate—basically separate lives for the majority of the time [of their marriage]."

In his affidavit of financial status, Chad claimed assets of $66,554.90, and debts—mostly farm loans—of $186,936.32, leaving him with a net worth of negative $120,381.32. In her affidavit of financial status, Laura claimed assets of $11,166.00, and debts—mostly student loans—of $39,100, leaving her with a net worth of negative $27,934. In the court's property division, each party was awarded their own bank accounts, vehicles, and personal property.[1] Chad was awarded the farm equipment and livestock. Each was saddled with their own debt.

The district court concluded:

> Chad would like to walk away with the farming operation and its debt. Despite the fact that marital property (the sale of the farm) contributed to Chad's success at farming, Chad wants Laura to have none of the substantial value of the farm as an ongoing concern.
> While neither party called an appraiser or valuation expert to testify (the court understands those are expensive), the amount of money Chad carried in his account (while Laura was seeking financial help elsewhere with Chad's knowledge), and the fact that nearly all the farm's expenses are depreciation related, the court concludes the farm operation is profitable. The court must, even if it cannot divide properly equally, divide it equitably.
> Given the length of the parties' marriage, the disparity of the parties' incomes, and Laura's need to establish herself, the court thinks an equalization payment is in order.

The district court ordered Chad to pay Laura $70,000 as an equalization payment. The court noted its determination was "based on a $45,000 annual income from farming. The court is awarding slightly over half of three years' farm income," and

---

[1] Both parties were upside down on their respective vehicles.

"[t]his contemplates the sale of the [grandfather's] farm, the tax refunds, Chad not paying spousal support, and Laura's work comp settlement, among other matters."

Chad argues the court's farm-income determination was an error, and he contends the court should not have included it in making its determination of an equalization payment. He points to his tax returns as proof there was not "three years' worth of profit that Laura should have received by way of a property settlement."

As we concluded above, the district court was in error in concluding Chad's farming operation netted $45,000 per year, but we cannot ignore other findings of fact by the district court:

> The parties maintain separate checking accounts. Chad asserted this is because Laura is financially irresponsible. However, Laura pays for nearly all of the household expenses (rent, utilities, and groceries). She pays for the automobile she drives. Chad pays for things like cell phones, cable, and internet services. He seldom contributed to the necessary family expenses, and after he left the family home, when Laura was behind on the utility bill, he did not do anything to help her pay it. When asked if he was concerned that his children were in a home with no power, he responded that they could stay with him.
> Laura requests that Chad be responsible for one-half of the electric bill she incurred.
> Laura says she asked Chad often for money. Chad claimed to be unaware Laura needed money. The court found Laura's testimony to be more credible. Laura had to seek assistance outside of the marriage, and the court believes Chad was aware of this.
> The parties received significant sums of money during their marriage. Chad sold a farm the couple bought. Laura claims she was unaware of how much profit was made (there was profit). The money was used, according to Chad, to reinvest in his farm operation and pay off debt. Laura received a substantial workers' compensation settlement. She claims it was used to pay her debts.
> Laura asserts there should be funds left from the farm sale. Chad claims most of the sale proceeds were applied to farm debt.

It is troubling that marital property, the sale proceeds of the farm, were syphoned off to Chad's farming operation with no apparent benefit to the family. On the other hand, Laura's workers' compensation settlement was used to directly benefit the family.

Iowa Code section 598.21(5) requires marital property be divided equitably in dissolution-of-marriage cases. *See In re Marriage of Hansen*, 733 N.W.2d 683, 702 (Iowa 2007). "The partners in the marriage are entitled to a just and equitable share of the property accumulated through their joint efforts," *In re Marriage of Hazen*, 778 N.W.2d 55, 59 (Iowa Ct. App. 2009), but it "is important to remember marriage does not come with a ledger," *In re Marriage of Fennelly*, 737 N.W.2d 97, 103 (Iowa 2007). In determining how to equitably divide the property, an "equitable division is not necessarily an equal division." *Hansen*, 733 N.W.2d at 702. Though "it is generally recognized that equality is often most equitable," *Fennelly*, 737 N.W.2d at 102, "[e]quitable distribution depends upon the circumstances of each case," *Hansen*, 733 N.W.2d at 702. Consequently, precedent is of little value. *See McDermott*, 827 N.W.2d at 682. "[K]eeping in mind there are no hard and fast rules governing economic issues in dissolution actions," we must apply the factors contained in section 598.21(5) in reaching an equitable division. *Id.*

Under all the circumstances presented, we agree with the district court that "[g]iven the length of the parties' marriage, the disparity of the parties' incomes, and Laura's need to establish herself . . . an equalization payment is in order." But we believe the amount of the district court's award to be flawed. The district court's $70,000 equalization payment award was based upon a $45,000 per annum farm income. As pointed out previously, this was in error. We calculated, for child

support purposes, Chad's annual farm income to be $3100 a year. We conclude equites entitle Laura to an equalization payment of $10,000—approximately three years' farm income. Chad shall pay this amount to Laura within ninety days of the issuance of procedendo. We affirm the trial court's equalization payment award as herein modified.

### IV. Conclusion.

We remand to the district court for recalculation of Chad's child support obligation under the guidelines while accounting for $3100 annual income attributed to Chad's farming operation. We affirm the district court's award of the equalization payment to Laura as modified. We affirm the district court's decree in all other respects.

### V. Appellate Attorney Fees.

Finally, Laura requests an award of her appellate attorney fees. Such an award is not a matter of right but rest within our discretion. *See In re Marriage of Sullins*, 715 N.W.2d 242, 255 (Iowa 2006). We consider "the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal."

We decline to award Laura appellate attorney fees.

**AFFIRMED AS MODIFIED AND REMANDED WITH INSTRUCTIONS.**